READING COMPANY, A CORPORATION OF THE STATE OF
PENNSYLVANIA, PLAINTIFF-RESPONDENT, v. TOWN-
SHIP OF WOODBRIDGE, A MUNICIPAL CORPORATION,
DEFENDANT-APPELLANT, AND DIRECTOR, DIVISION
OF TAXATION AND DIVISION OF TAX APPEALS, DE-
PARTMENT OF THE TREASURY, RESPONDENTS.

Argued November 16, 1964—Decided August 4, 1965.

408

*Mr. Leo Rosenblum* argued the cause for defendant-appellant.

*Mr. Raymond J. Lamb* argued the cause for plaintiff-respondent (*Messrs. Lamb, Blake, Hutchinson & Dunne,* attor-

neys; *Mr. Lamb* and *Mr. Lockwood W. Fogg, Jr.,* of the Pennsylvania Bar, of counsel).

*Mr. Arthur J. Sills,* Attorney General of the State of New Jersey, filed a statement in lieu of brief on behalf of respondent Director, Division of Taxation (*Mr. Alan B. Handler,* First Assistant Attorney General, of counsel).

The opinion of the court was delivered by

HALL, J. This railroad tax litigation involves the classification and valuation of real property of the Reading Company ("railroad") in its Port Reading Terminal Yard in the Township of Woodbridge. The classification question—where the "main stem" should be located within the yard and thus what portion of the terminal property should be taxed as Class I railroad property and what portion as Class II—concerns taxes for the years 1952 through 1958. The valuation question—the true value and appropriate assessments of the Class II property within the yard—relates to the years 1956, 1957 and 1958. The litigation originated in appeals by the railroad to the Division of Tax Appeals ("Division"), *N. J. S. A.* 54:29A–31, from the determinations of the Director of the Division of Taxation ("Director") on both questions for all of the respective years and appeals by the township from his valuation determinations for the years 1957 and 1958. All the classification appeals were tried together followed by a separate hearing on all the valuation appeals. The matter is before us on the township's consolidated appeals to the Appellate Division from the judgments of the Division of Tax Appeals, *N. J. S. A.* 54:29A–36, *R. R.* 4:88–8(a), which were certified on our motion before argument in the intermediate tribunal.

While the two questions are distinct and will be so treated, they both arise out of the basic scheme for the taxation of railroad property in this State. The substance of that scheme has been in effect for more than three-quarters of a century. *L.* 1873, *c.* 400, *p.* 112; *L.* 1884, *c.* 101, *p.* 142. The present

statutory form, which governs this case, is found in the railroad tax law of 1948. *L.* 1948, *c.* 40, *p.* 114; *N. J. S. A.* 54:29A–1 *et seq.*

The statute, *N. J. S. A.* 54:29A–17, provides for the annual assessment at true value by the Director of the Division of Taxation of all property used for railroad purposes in the State according to the following classes, in lieu of all other state or local property taxes (*N. J. S. A.* 54:29A–11):

"I.  The length and value of the main stem of each railroad * * *;

II.  The value of the other real estate used for railroad purposes in each taxing district in this State, including the roadbed (other than main stem), tracks, buildings, water tanks, riparian rights, docks, wharves and piers, and all other real estate, except lands not used for railroad purposes;

III.  The value of all the tangible personal property of each railroad."

Property in Classes I and III is taxed state-wide at the uniform rate of $1.20 per $100.00 of assessed valuation, *N. J. S. A.* 54:29A–20(a), and the receipts therefrom are paid to and applied by the State to its uses, *N. J. S. A.* 54:29A–23. Class II property, on the other hand, is taxed by the Director pursuant to his assessments at the general tax rate in each taxing district where the particular property is located, *N. J. S. A.* 54:29A–19. The tax so computed is collected by the State but transmitted to each municipality for local and county purposes. *N. J. S. A.* 54:29A–24.

Since local tax rates covering Class II property are ordinarily several times the $1.20 state rate applying to Classes I and III, railroads are interested in having as much of their real property as possible classified as "main stem." Conversely, municipalities in which large amounts of railroad terminal, yard and pier properties are located are desirous of having such installations, or the major portion of them, designated as Class II property and are as well concerned that the Director's valuations of property so classified represent true value. These competing economic considerations are at the bottom of the controversy before us.

I.

## The Classification Question

This issue involves the proper location of the main stem within a railroad terminal yard. The question is somewhat complicated because this particular freight yard is essentially a single purpose installation. Better than 95% of the cargo carried by the trains ending their runs in the yard is coal which is ultimately dumped from the cars into barges moored at the railroad's pier, located on the property and extending into Arthur Kill, for transshipment by water to final destinations in other parts of the metropolitan area. If the main stem in this yard should properly encompass the tracks leading to and on the pier, the further question is presented whether the pier itself and the extensive equipment and structures utilized in the car-dumping operations should also be included as Class I property.

Although the "main stem" concept has existed as a basis of classification for tax purposes in our statutes since *L*. 1873, *c*. 400, *p*. 112, there has been little reported litigation in which the term has been construed and none to our knowledge so far as terminal yard property is concerned. This case is a rare one.

Before outlining the undisputed facts, the definition of the term in the current statute should be set forth:

" '*Main stem*' *of a railroad means the roadbed not exceeding one hundred feet in width*, as measured horizontally at the elevation of the base of the rail, including the full embankment or excavated area, with slopes, slope ditches, retaining walls or foundations necessary to provide a width not to exceed one hundred feet at base of rail, *together with all tracks, appurtenances, ballast and all structures erected thereon and used in connection therewith, but not including passenger or freight buildings erected thereon." N. J. S. A.* 54:29A–2 (emphasis added)

The Port Reading branch of the Reading system runs from a point on its Philadelphia-Jersey City line near Bound Brook to this terminal yard on the Arthur Kill. It was constructed

about 1892 to give the railroad its own New York metropolitan area seaboard terminus for anthracite, and later bituminous, coal shipped over its lines from mines in Pennsylvania. As the branch reaches the entrance, or throat, of the yard, almost a mile west of the waterfront, it has two tracks, one for eastbound and one for westbound traffic. Within the yard, the tracks fan out to become 60 or more in number, grouped in areas given specific names, for the receipt of arriving trains, storage of full cars until their contents are shipped out by barge, storage of empty cars pending return movement to the mines and the make-up of westbound trains. Apart from the facilities connected with the dumping of coal into the barges, the yard contains an office building, train crew accommodations and structures for the servicing of engines and other equipment, many of which have become more or less obsolete by the substitution of diesel locomotives for steam power.

When the yard was first constructed, an elevated pier (Pier 1) was built at the waterfront to which cars were moved from the yard tracks and the coal contents emptied into waiting barges by gravity chutes from the hoppers underneath the cars. Sometime later two other piers (Piers 2 and 3) were built for the same purpose. In 1917 the railroad erected a more elaborate pier north of the other three and installed a McMyler car dumper thereon. This huge mechanical device actually picks up a coal car, turns it over and empties the contents into a barge moored alongside. On the tracks approaching this pier, a thawing plant structure was constructed to thaw frozen coal in the cars during the winter months so that the contents could be easily dumped. After the installation of the dumper, all bituminous coal shipments were transferred to barges by this means. The use of Piers 2 and 3 ceased and Pier 1 was continued in service to transfer sized anthracite until 1946 when it was removed from service. It was dismantled in 1950 and all tracks removed from it. Since then all transshipment operations have taken place on the car dumper pier.

Despite the pier changes, the method of receiving trains in the yard and the handling of cars thereafter until the coal has been dumped into barges has not substantially differed over the years. When a loaded train pulls into the yard, the eastbound tracks through the throat lead into areas of yard tracks known as the North, New and South yards. The car dumper pier and tracks leading into it (which cannot be reached directly from the entering tracks without switching) are north of these areas. Pier 1 and the tracks leading to it (now removed) lay between the New and South yards. The arriving train is directed to empty tracks within any of these three named yards and the over-the-road journey of the cars comes to an end thereon. The locomotive and caboose are removed and the train crew turns over all documents to the yard master's staff. Thereafter the cars are handled only by the yard crew. They are clerically classified and those which are expected to be moved to the car dumper in the near future may remain on the tracks in these three receiving yards. The remainder are moved by yard engines to the larger storage areas north of the dumper area (where emptied cars are also stored pending movement back to the mines) to await receipt of orders for barge shipment. When shipment orders are received, cars to fill them are switched to the tracks leading to the thawing plant and dumper pier where the contents are quickly dumped into barges and the empty cars shunted to the north storage areas. Ultimately, of course, all cars brought into the yard from the west find their way by yard crew switching operations to the dumper pier for water transshipment of the coal to its final destination.

At least since 1911 (and probably since the construction of the terminal) until the tax year 1957, the 100-foot-wide main stem within the yard, as designated by the state taxing authorities, extended from the throat of the yard to the outshore line of Pier 1 and included the tracks leading up to and upon the pier and the pier itself. The tracks from the throat to the pier were not those upon which over-the-road trains came to rest as previously described. As far as the rec-

ord shows, the railroad did not request a relocation after the dumper pier and equipment were constructed in 1917 although the new installation served the bulk of the transshipment traffic from that date, nor did the township at any time apply for relocation of the main stem. Request was made, however, by the railroad in 1950 after Pier 1 was dismantled to the piles and the tracks leading to it removed. The new location sought by the railroad encompassed the tracks leading to and upon the car dumper pier, the pier itself, the dumper, thawing plant and other equipment and buildings along and over these tracks, the pier equipment and buildings being included on the theory that they constituted "structures erected [on the main stem] and used in connection therewith" within the intent of the statutory definition. The request was disregarded. The application was renewed by formal petition to the Director for the years 1952 through 1956, and in each instance denied, with appeals therefrom annually taken by the railroad to the Division of Tax Appeals. The Director took no affirmative action until the tax year 1957, although there was no basis whatever for continuing the so-called Pier 1 main stem after the pier had been demolished and the tracks leading to it taken up.[1]

---

[1] There is some suggestion in the record that state non-action on at least the first two requests for change was in part occasioned by the fact that the center line filed by the railroad was not located within the new main stem designation it urged. (The railroad filed a new center line with the Secretary of State in December 1952, coinciding with the center of the proposed new main stem). Apart from the further fact that the pre-1952 center line was never within the Pier 1 main stem either, but south of it, we do not think that designation of the center line has any exclusive binding force on main stem location. Center line designation has to do with the survey of the route and location of the main line and branches of a railroad required to be made and filed by a railroad with the Secretary of State. *R. S.* 48 :12–24. It is a unilateral act by the railroad and should not foreclose state factual determination of main stem location for taxation purposes in accordance with the statutory definition of that term. Center line and main stem are not necessarily the same, although it has been said they should be so treated "in default of other proof." See *Jersey City v. State Board of Assessors*, 74 *N. J. L.* 720, 724 (*E. & A.* 1907).

Finally, in 1957, the Director ordered a resurvey of the terminal by his engineering staff, as a result of which he relocated the main stem for that and subsequent tax years. He placed it as a 100-foot-wide strip of trackage (which had no appurtenant buildings) within the New Yard, running from the throat to the physical bulkhead line at the water's edge. The New Yard, it will be recalled, is one of the three trackage areas between former Pier 1 and the dumping pier where over-the-road trains come to rest. The railroad appealed from this determination to the Division as to the years 1957 and 1958. The Division held on all the classification appeals that, while the main stem was improperly retained at the old Pier 1 location from 1952 through 1956, the Director was in error in his 1957 relocation. It decided that the car dumper pier location requested by the railroad was the correct one from 1952 on and that the main stem so designated should include not only the tracks leading from the throat to and upon the pier, but also the pier itself, the dumper, the thawing plant and other equipment and structures within the 100-foot width. The township, on the appeal before us, urges the correctness of the Director's 1957 location and suggests further that a main stem should never extend beyond the throat of a terminal yard.

The contentions of the parties and the diverse determinations of the Director and the Division devolve from two different concepts of main stem within a terminal yard (putting aside for the moment the township's further suggestion that it should never extend beyond the yard throat).

The railroad's theory, substantially adopted by the Division, is that main stem within a terminal yard should encompass that 100-foot width of trackage therein over which the major portion of the traffic flows, without regard to where over-the-road trains come to rest. This being a yard where all but a very small fraction of the cargo goes on through the yard to a final destination by water and all the coal has to go over the tracks to and upon the dumper pier to be transshipped to that destination, these tracks are the only ones in the yard over

which all this traffic must flow and which must be kept clear. Correlatively it is argued that the pier itself and the structures and equipment within the 100-foot width are necessary to accomplish that end and so are appurtenances and structures erected on the main stem and used in connection with it. The underlying thought appears to be that this yard is not the end of the journey but merely a transshipment point so that the pier and its equipment are comparable to a bridge on the main line. The reasoning is buttressed by a contention of practical construction arising from the designation of the Pier 1 main stem, under the same conditions, for so many years and by the argument that the Division's conclusion represents an expertise finding of fact supported by the evidence which, under usual principles of review of administrative action, should not be judicially disturbed.

The Township, following the reasoning of the Director, on the other hand, advocates the proposition that main stem generally has reference to a railroad's through route, as a highway across the State, and therefore that it should be located within any terminal yard among those tracks where that through route stops, *i. e.*, where the road engine and road train comes to the end of its journey and the over-the-road crew surrenders the cars to the yard crew. (The railroad does not dispute the Director's finding that the 1957 main stem as he located it encompasses such an area.) It is said that every terminal yard requires transshipment of freight within and beyond the yard by some means to an ultimate destination at some further point and that the single purpose of this yard and the method of transshipment should not alter the result. It is therefore urged that the dumping pier and the trackage, structures and equipment related to it cannot in any event properly be said to constitute tracks, appurtenances and structures used in connection with the railroad's main highway, so to speak. At most they would be freight buildings expressly excluded from main stem property by the definition in *N. J. S. A.* 54:29A–2 and properly within the terminology

of "buildings" and "piers" included within Class II property by *N. J. S. A.* 54:29A-17.

This thesis was presented to the Division by the testimony of Aaron K. Neeld, a very knowledgeable and experienced public servant in the state taxation field, who directed the relocation in 1957. At the time of his testimony he had been Director of the Division of Taxation since 1954, Acting Director between 1949 and 1954 and in the state tax service for some 35 years before that. He projected the rationale just outlined as the proper concept of main stem and strongly expressed the view that it should never extend in a terminal yard beyond the physical bulkhead line at the waterfront, should not include piers and should never encompass unloading or transshipment structures or facilities. He stated that the original Pier 1 main stem location here was definitely erroneous and was not consistent with main stem location in other terminal yards in the State. Although the record is not entirely precise, we gather that while a designation similar to the pre-1957 main stem at Port Reading may well have been made in past years with respect to a now abandoned coal terminal facility and dumping pier in Perth Amboy, other similar yards had been and were being treated in a fashion comparable to the 1957 relocation, as were all other general freight terminal yards at tidewater regardless of whether the cargo is transshipped to ultimate destination by car-unloading and transport of contents by truck or lighter or by movement of the loaded cars themselves on car floats.

Turning to our evaluation of the problem presented, we find little assistance in the statutory history. While the definition of main stem and related references have undergone some variation in the course of the various railroad tax laws, the differences do not appear significant in the instant context. In the first act permitting municipal and county governments to receive some tax revenue from railroad property, *L.* 1873, *c.* 400, *p.* 112 (prior to that time railroad taxation had been for state benefit only pursuant to private corporate charter), the pattern was set of exemption from such local taxa-

tion for "the main stem or road bed and track, not exceeding one hundred feet in width."[2] This early statute contained no further definition. It did, however, further exempt from local taxes "at the termini of their said roads, * * * a tract of land not exceeding ten acres, to be in one parcel, * * * with the buildings and improvements thereon. * * *"

The present triple classification of railroad property for tax purposes first appeared in L. 1884, c. 101, p. 142, which apparently superseded the 1873 statute. The constitutionality of the statute was upheld in State Board of Assessors v. Central R. R. Co., 48 N. J. L. 146 (E. & A. 1886). The categorization there of Class I and Class II property is in almost the same language as is found in the railroad tax act of 1948, except for inclusion of appropriate references to canal property now deleted. Main stem was again defined as "the roadbed not exceeding one hundred feet in width, with its rails and [slopes] sleepers [and], depot buildings used for passengers connected therewith." The 10-acre terminal exemption from local taxation found in the 1873 law was not continued. Perhaps it could have been then argued that thereby the main stem was not intended to extend into a terminal yard, but we can find no record of any such contention's having been adjudicated and, as a matter of practical administration by the state taxing authorities, the main stem has always been extended into terminal yards.

The definition was slightly changed by L. 1906, c. 122, p. 220, to include buildings erected on the main stem and used in connection therewith, but excepting both passenger and freight buildings. The 1948 statute is in substantially the 1906 form with the addition of refinements to cover embank-

---

2 The maximum 100-foot width limitation, which was continued without change to date, may be thought to have originated in another statute in the same year providing for the general incorporation of railroad companies, which stated that any railroad constructed thereunder should not exceed 100 feet in width unless more land should be required for the slopes of cuts and embankments. L. 1873, c. 413, p. 92, § 11. See also L. 1877, c. 31, p. 48.

ments, slopes, ditches, retaining walls, appurtenances and the like.

The most one can gain from this progression of definitions is the uniform emphasis on the "roadbed" of maximum limited width and appurtenances and structures used in connection therewith, which appears to connote intended reference to the main stem as the through railroad artery with its branch lines, across the state and facilities, such as bridges, signal towers and so forth, needed for the physical operation of trains thereon as distinct from buildings to accommodate passenger and freight traffic at particular locations.

As earlier indicated, there are few reported cases dealing with main stem and none involving the precise question before us. The concept seems not to be utilized outside this State. The language of those opinions of our courts which have considered the matter at all appear to accord with the just mentioned connotation we derive from the statutory history, though in quite different and, for the most part, more general contexts than that with which we are concerned. In *Jersey City v. State Board of Assessors*, 73 *N. J. L.* 164 (*Sup. Ct.* 1906), reversed in part 75 *N. J. L.* 571 (*E. & A.* 1909), the court said:

"What is main stem is left to be determined as a matter of fact, not by anyone's arbitrary determination. * * * It remains only to determine in each particular case, which line of track answers the legislative definition. There is no distinct definition of main stem in the statute, and its meaning must be gathered from the different statutory provisions." (73 *N. J. L.*, at *p.* 169)

A companion case bearing the same name, 74 *N. J. L.* 720 (*E. & A.* 1907), contains this language:

"Every railroad must have a main stem. The 100 feet of main stem of any railroad must, of necessity, be selected from that part of its right of way or roadbed, or other property upon which is laid, or proposed to be laid, the tracks over which its freight and passengers (if it carries passengers) are transported. All tracks outside of the 100 feet, and the land upon which they are laid, and also tracks used exclusively for chutes into factories, and for yards, and the like, or

used in the ordinary transaction of business for cars at rest, are not embraced within this definition, and could not have been intended to be embraced within the term main stem as used in the statute.

\*     \*     \*     \*     \*     \*     \*     \*

Both these lines which it is sought to tax only as property other than main stem lead to terminals, and are absolutely essential to through freight reaching such terminals."

The court held the two branch lines in question leading from a main line to dock areas were main stem. (74 *N. J. L.,* at *pp.* 724, 727)

The following comment is found in *In re United N. J. Railroad and Canal Co.,* 75 *N. J. L.* 385 (*Sup. Ct.* 1907), reversed on other grounds 76 *N. J. L.* 830 (*E. & A.* 1908) :

"The term 'roadbed' is of plain import. It signifies the bed or foundation upon which rests the superstructure of rails and sleepers. Giving due effect to the word 'main' in the phrase 'main stem,' the roadbed that is to constitute main stem must be deemed the bed or foundation of the principal tracks of the railroad at the place in question." (75 *N. J. L.,* at *pp.* 386–387)

The fullest discussion of the concept and the reason behind it is found in the language of Justice Pitney in *Central R. R. Co. of N. J. v. State Board of Assessors,* 75 *N. J. L.* 120 (*Sup. Ct.* 1907), reversed in part 75 *N. J. L.* 771 (*E. & A.* 1908).

"The purpose of this subclassification is to designate a portion of the mass of real estate that is used for railroad and canal purposes, upon which portion taxes are to be levied for the support of local and municipal government, either together with or separate from taxes for the support of the general state government, leaving the residue of the property that is used for railroad and canal purposes to be subjected to taxation for general state purposes only. The line of demarcation between the two subdivisions is chosen with little reference to the use to which the property is devoted, but with especial reference to the location and situation of that which is to be locally taxed. Structures *used* in connection with the roadbed are placed on one side of the chosen line; buildings *used* for accommodating passengers or freight, on the other. So far the line of definition follows the use. Aside from this, use has little or nothing to do with it.

\*     \*     \*     \*     \*     \*     \*     \*

It will thus be seen that the distinction between the strictly essential 'right of way,' so called, of a railroad—the strip of land without which it could not exist as a public highway and means of

transportation across the state—and the remaining land of the company used for railroad purposes, is inveterate in our legislation. So far as the setting of these two different sorts of property into separate classes for purposes of taxation is concerned, the distinction rests, as we conceive, not so much upon the ground that they are devoted to different uses, as that the dependence of the several companies upon local police protection and the other advantages of municipal government, the benefits to be derived by them from such government, and hence the proper admeasurement of the tax that should be contributed by the companies to the respective local governments, are proportioned approximately to the amount of land held by them in the several municipalities above and beyond the main stem that is indispensably necessary for their traffic. This notion is expressed in the preamble of the act of 1873 for the taxation of railroad corporations above cited. The same notion is implicit, we believe, in the railroad tax acts of 1884 and 1888.

\*     \*     \*     \*     \*     \*     \*     \*

It is strongly urged that at many points upon our principal lines of railroad, and more especially at their terminals, the roadbed actually occupied by tracks for the purposes of through traffic extends far beyond 100 feet in width, and that there is no difference between the mode in which the strip called 'main stem' is used and that in which the adjoining portions are used. It is pointed out that in the case of the Lehigh Valley Railroad, for miles at Jersey City, and at several other points, the railroad tracks cover the entire surface of the earth for several hundred feet in width, and are indistinguishable from each other by any physical marks; that they are all constantly used for railroad purposes; that switches unite them, and they occupy the ground without any reference to whether it is main stem or adjacent property. And that in a great terminal station like that of the Pennsylvania Railroad in Jersey City, some 250 feet in width, a strip of land 100 feet in width under the station is assessed as main stem by the state board, and the rest of the land and tracks under the station and the roof over the whole station, including main stem, are assessed by the local board of Jersey City. If the distinction between main stem and second-class property depended upon the use to which the property is devoted, these circumstances would possess much force. As already remarked, it does not depend upon that distinction, but rather upon the ground that by reason of the great extent and value of the railroad property at the points in question it is reasonable and proper that the railroad companies should contribute more largely to the cost of the local government than in other places where the amount of their property is less." (75 *N. J. L.*, at *pp.* 139, 142–143, 144–145)

■■ Our own consideration of the question presented leads us to the conclusion that the Director, and therefore the township, has the better of the argument. There is much to

be said, as Director Neeld stated at the hearing, for the proposition that main stem should stop at the throat of a terminal yard. While the classification has support in reason outside of terminal properties and in the course of a railroad's line through the State, there seems little logical sense to it when the one, two or four through tracks fan out in a terminal into dozens covering a width of hundreds of feet, on any of which a train may come to the conclusion of its trip depending on track conditions at the time. But, as the Director also said, it is much too late to take this view now after more than a half-century of practical administrative construction carrying the main stem into a terminal to encompass a 100-foot width of trackage therein as selected by the state taxing authorities. Since we may not therefore reach this conclusion, we are persuaded that main stem in a terminal yard should include only that trackage in the yard itself to a maximum width of 100 feet, upon which trains come to rest at the end of the over-the-road journey and should end at that point. We believe that this conclusion best comports not only with the division of taxation's purpose of the statutory classification but also with the underlying theory that main stem fundamentally has reference to a railroad's arteries as public highways across the State. The particular nature of the cargo and method of transshipment in the Port Reading yard should not call for a different result here. Passengers and freight never reach their final destination at any railroad terminal or yard.

We are not barred from reaching this conclusion, as the railroad asserts, either by the scope of judicial review or the matter of prior practical construction here. The conclusion is basically a legal one—the meaning and application of "main stem" in an undisputed factual situation—rather than a matter of the usual review of an administrative fact finding. In such a setting the Division would seem to have little more expertise than this court and both of us ought to accord due deference to the Director, whose department has been dealing with the location of main stem at the practical level for years and years. Indeed, the Division itself said not too long ago

that it should not disturb the Director's classification of main stem except for palpable error. *In re Application of the City of Jersey City, 26 N. J. Misc.* 31, 35, 56 *A. 2d* 126 (*Div. Tax Appeals* 1947). No such error is conceivable in the Director's 1957 main stem relocation here.

As far as practical construction goes, we think it works against rather than in favor of the railroad. The Division relied heavily in reaching the result it did on the pre-1957 Pier 1 main stem designation. But Director Neeld candidly said, and we thoroughly agree, that this earlier location was completely erroneous. The doctrine of practical construction, as useful as it is in resolving doubts and ambiguities, should not be applicable where it is based on an error of this magnitude. This is especially so since the particular construction relied on is contrary to that adopted by the Director and his predecessors in all other terminal yards with but one other possible exception.

We therefore hold that the Director was correct in his 1957 relocation of the main stem, effective as of the tax year 1952, and that the Division was consequently in error in its contrary determination. This conclusion makes it unnecessary to consider whether the dumper pier itself, the tracks thereon, and the dumper and other related structures and equipment would be classified as Class I property if the main stem were to be located to cover the tracks leading to that pier.

## II.

### The Valuation Question.

The limited issues projected by the township's appeal under this heading should be approached in the light of the presentation of this aspect of the case in the Division. The over-all valuation question had two different, but partially interrelated, facets which were tried together and in effect decided as one. Both involve the matter of the proper assessment of the railroad's Class II property for the years 1956, 1957 and 1958. As previously stated, this class comprises real property

used for railroad purposes other than main stem. It is taxed, according to assessments made by the Director at true value, at the general tax rate for the municipality where located. The tax is collected by the State but paid over for local and county use.

The railroad in its appeals from the Director's assessments for these years claimed only unconstitutional discrimination. It alleged that the Class II assessments had been based upon a standard equal to or in excess of true value whereas the real estate of other owners in the township had been locally assessed at considerably below true value. It asked the Division to establish the true value of its Class II properties and then to compute its assessments by reducing the same to that percentage of true value which was the common level of local assessment of other real property in the township. The right of a railroad to such relief was established by *Delaware, Lackawanna and Western R. R. Co. v. Neeld*, 23 *N. J.* 561 (1957). The railroad's property involved—land and improvements comprising track, buildings and other structures and installations—was the same for each of the three years except that it included for 1956 only a creosoting plant comprising 72 acres of land with structures in part of the yard in Woodbridge (plus an additional 32 adjacent acres in Carteret). This plant with the 105 acres of land was sold in April of that year to an industrial concern and the items comprising it were removed from the assessment list in 1957.

The township's appeals to the Division for 1957 and 1958 (although no formal appeal was filed for 1956, the Division treated the matter as if one had been and no objection is posed on this score) were quite independent of the railroad's appeals and had no necessary connection. In fact they were filed in each year prior to those of the railroad. They complained that the Director's assessments were at less than true value and sought increase of the respective assessments to actual true value.

The Division tried all the appeals together. This was feasible because one element of the discrimination appeals

and the whole of the township's appeals required the determination of true value of each of the respective items of the railroad's property, even though one appellant might ultimately prove entitled to relief on its appeals and the other not.

Two major elements were necessary for the railroad to make out a case of actionable discrimination, the proofs as to which were presented at the outset of the Division hearing. The first was to demonstrate that locally assessed real estate in Woodbridge Township was assessed at less than true value and what the common assessment level (percentage of true value) of such property actually was. This the railroad did by very voluminous evidence. (The presentation of proofs was concluded prior to this court's decision in *In re Appeals of Kents 2124 Atlantic Ave., Inc.*, 34 *N. J.* 21 (1961), which clarified and simplified a complaining taxpayer's burden and method of proof in such a situation.)

The second was to prove the true value of its property to establish the figure upon which the common level percentage would operate to produce the proper assessment for such property. If this were not required, a complaining taxpayer whose real estate was assessed on a basis greater than the common ratio but at less than actual true value would receive a benefit greater than that to which he should be entitled *vis-a-vis* other property owners in the municipality. The railroad recognized it had to sustain this burden of proof and sought to do so *prima facie* by the testimony of the Director that his assessments of Class II railroad property were at true value, plus evidence of changes of use and condition in this yard over the years upon which to ground findings of functional and economic obsolescence and depreciation for reduction of a physical appraisal dollar figure in order to arrive at actual true value. The Division acquiesced in this proof theory and the hearing panel ruled that the burden of going forward on the matter of value thereby shifted to the township. The latter then offered its value proofs by expert testimony as to some but not all of the items. With respect to the buildings

and structures on which such testimony was offered, the basis of dollar opinion was essentially reproduction cost less physical depreciation, with no allowance for obsolescence. The railroad in turn offered rebuttal dollar value proofs again as to some but not all of the items.

The ruling of the Division on the method of a complainant's proof of true value and the shift in the burden of going forward was also made, of course, prior to our decision in *Kents*, although it did not decide the case until after that opinion was handed down. In *Kents*, we said on this problem:

"The burden is his [the complaining taxpayer's] to establish with *independent* proofs the true value of the parcel with its improvements and that the total assessment of the improved parcel substantially exceeds the ratio of assessment of real property in the taxing district." (34 *N. J.*, at *pp*. 33–34, emphasis added)

(The Division made no mention in its opinion of this aspect of *Kents*.)

The Division held that the railroad had established local assessment of real property generally in the township at substantially less than true value for the three years in question and that the local assessment ratio was 16% of true value. It then reached its dollar conclusions of true value as to each item of the railroad's property—land, track, buildings, structures and other installations—based on the total proofs, with allowances as it found appropriate for functional and economic obsolescence as well as physical depreciation. (Not every item was individually discussed in the decision but all are separately listed in the judgments. Because it had earlier found on the classification aspect of the case that the tracks leading to and upon the car-dumper pier, the pier itself, the dumper, thawing shed and other related installations should be classified as main stem, it made no value determinations as to these items although proofs had been offered thereon at the discrimination-value hearing since that hearing was commenced before the panel report on the classification issue was filed.) In no instance did the Division find true value of any

item to be less than the Director's assessment therefor. Where the proofs showed a true valuation of less than his figure, his assessment was confirmed. The same is true where neither party offered any independent evidence as to an item. In many instances, the Division substantially increased the Director's assessment. The Division then took 16% of the figure it thus determined for each item to arrive at the proper assessment.

We said at the outset of this portion of the opinion that the issues projected by the township's appeal to us are limited ones. It is therefore important to have in mind what is not attacked as well as what is. The township does not quarrel with the finding that other local real estate is assessed at substantially less than true value, that the common assessment ratio thereof is 16%, and that, as a general proposition, the railroad is entitled to have its Class II property assessed on that percentage of true value. It does not object to the Division's valuation of the land, where it turned out there were full independent value proofs on both sides, except with respect to the 72 acres comprising the creosoting plant as to 1956 only, nor does it raise any question concerning the valuation of the substantial item of track. Conversely, the railroad has not cross-appealed from any determination of the Division, thereby indicating its acceptance of the item values fixed by it.

The points the township does make, to which we should limit our attention, are confined to the Division's valuations as to structures (except with respect to the creosoting plant land as to 1956) and may be summarized as follows:

1. The railroad did not sustain its burden of independent proof of true value of the structures as required by *Kents*.

2. The Division erred in arriving at the various percentages it used for functional and economic obsolescence because of the absence of evidence to support them.

As to these points, it urges that all the structure valuations for the three years "be set aside and (a) the original assessments reinstated" (*i. e.*, at their full amount without applica-

tion of the 16% ratio), "or (b) the matter remanded to the Division for consistent action."

3. In any event, since no proofs were offered by either side, probably due to oversight, with respect to the valuation of the 72 acres of land and the structures constituting the creosoting plant as to 1956, the Director's assessments thereon should be restored (*i.e.*, at their full amount without application of the 16% ratio).

■■ As to the first point urged, the township is technically correct, speaking as of the date of the Division's decision, in saying that any taxpayer complaining of discriminatory assessment must, as part of his case, establish the true value of his property by independent proofs and may not rely for that proof on the taxing authority's assessment. This is what was meant by the previously quoted passage from *Kents*. The soundness of the requirement, which is just as applicable to the Director as to a municipal assessor, is demonstrated by the evidence in this case. Although the Director testified that his policy and aim was to value railroad property "at its full fair market value as we are best able to determine it on the basis of the information at hand," he made it clear that "the tax history of the property in question as distinguished from a physical reappraisal of the property for the purpose of assessment" was utilized and that it had been many years since an actual physical appraisal or valuation had been done. The effect of the assessment method used is shown here by the fact that the Director's land assessment of approximately $1,074 per acre was increased by the Division to $5,000 per acre and his assessment of track in ballast amounting to $293,903 was raised to $605,000 (both before application of the 16% ratio). The Division pointed out in its decision that a revaluation of all railroad property in the State is very much needed, which the overburdened Director had been unable to undertake with an insufficient budget. Therefore it has to be said that the Division was in error, as a matter of hindsight, in permitting the railroad to rely on the Director's assessments for *prima facie* proof of true value and in shifting

to the township the burden of going forward with valuation testimony.

However, we are faced with a practical situation. The pronouncement of *Kents* did not exist when the Division ruled and we do not think that it can be said that the Division necessarily ought to have anticipated it here. This case has already taken years to reach its present status, involving voluminous hearings and untold expense. While there has to be a remand to the Division on this account, we think that what that remand should encompass ought to depend primarily on the extent to which the township may fairly be said to have been prejudiced. The position it asserts is a broad and technical one and we think it would be grossly inequitable to require the matter of the true value of each of the numerous items to be completely retried or to disallow completely the application of the 16% ratio for this reason. (We are speaking now of the items other than those comprising the creosoting plant land and structures for 1956, as to which we will comment separately.) Certainly as to the land, where there were complete value proofs on both sides despite the order of presentation, the valuation was fairly determined and this phase is not to be reopened. Neither should the track valuation be reconsidered, since the township does not object to it.

This leaves the various buildings and structures of substance, as distinguished from those of minor value as to which there was little or no testimony and where both sides appeared content with the Director's valuations. We need not list them in detail. As a practical matter, it would seem that the township value proofs thereof would have been at the highest possible figure. Where that figure was lower than the Director's assessment, his figure was confirmed and where the township figure exceeded his assessment, one would suppose the railroad's evidence of true value, if offered on its case, would certainly not have been higher than the township's proofs. The township's brief on this point paints with a broad brush and we are unable to determine whether it conscienti-

ously feels that, as to some items, it was actually prejudiced by the erroneous method and order of proof permitted. We therefore feel that it should be permitted informally to demonstrate to the Division in what respects and as to what items it can fairly say it was harmed and that, as to those items found by the Division to demand it on this score, the further testimony of each side should be taken, presented under the method required by *Kents,* and the true valuation of each such item redetermined upon which the 16% ratio will then be applied. In addition, there will, of course, now have to be a Division determination of the true value, on competent and properly presented proofs, of the tracks leading to and upon the car-dumper pier, the pier itself, the dumper, thawing plant and other structures which the Division had classified as Class I property and which we held earlier herein must be designated as Class II. We leave it to the Division to determine in the first instance, under the general principles outlined, whether or not the proofs presented at the hearing on these items, but not passed upon, are adequate for this purpose. In any event, either party should be permitted to supplement the same as may be desired.

▆ We find no merit in the township's second point that the Division erred in the percentage allowances for obsolescence which it applied in arriving at the true value of certain of the buildings and structures. It is not disputed that obsolescence is an appropriate factor to be taken into account in arriving at true value, but the point seems to be that there was not sufficient evidence to ground the percentages arrived at. While it is true that there is no specific evidence as to precise percentages, that is not at all fatal under the circumstances here. Again we need not go into great detail. The railroad presented on its case evidence, which was not contradicted, showing that the coal traffic in the yard had decreased drastically in recent years by reason of the almost complete discontinuance of the use of anthracite coal and a drop in its shipments of bituminous coal, which had resulted in a decrease, for this reason alone, in the operation of many

of the yard facilities and the number of employees and consequent nonuse of all or part of many of the buildings. It further showed that the substitution of diesel locomotives for steam power as well as other technological advances had rendered many of the special purpose installations obsolete and useless, as well as reducing the number of operating employees needed and thereby lessening the need for employee facilities. These proofs went into particularity with reference to each building and structure affected. We think this evidence clearly demonstrated functional and economic obsolescence as to the particular buildings and installations to which the testimony applied and that, with this background, it was well within the competence and expertise of the Division to translate such proof into percentages for the respective buildings without specific proof as to such figures. The evidence sufficiently supported its conclusions thereon. We see no basis to interfere with the Division's value determinations in this regard and the remand shall not extend to any such matter.

This leaves us with the township's third point—the matter of the valuation of the creosoting plant land and structures for 1956. Once more the township may well be asserting a technical rather than a realistic position. There is no specific mention in the Division's opinion of these particular items and there was no proof offered by either side concerning the valuation of the structures (the judgments simply adopt the Director's valuations). It may be that this aspect was completely overlooked by everybody; it also may be that the township felt the Director's structure valuations were adequate. As far as the land value is concerned, these 72 acres were simply part of the entire yard tract and it cannot be clearly ascertained from the record whether those expert witnesses whose testimony was thought worthy of consideration by the Division, who gave their valuation opinion on a general per acre basis, were applying that opinion to the whole tract or only to that part remaining after the creosote plant sale. The railroad suggests that the two parts of the tract are indistinguishable.

We see no reason to conclude, as the township urges, that this posture of affairs calls for a holding that the 16% ratio is not to be applied to all these items. Rather we think that this phase of the matter should have further treatment in the Division similar to that outlined with respect to the township's first point, *i.e.*, on the basis of harm or prejudice to the township. We think the Division should first determine whether it intended to decide that the $5,000 per acre land valuation discussed in its opinion applied, under the evidence, to the entire tract. If so, that will end any further controversy as to that phase. If not, the township should be called upon to make a showing that the true value of the creosote plant land is sufficiently different from the balance of the yard to warrant further testimony as to that segment. It should also be required to make a showing that it has actually been prejudiced by the Division's acceptance of the Director's structure valuations. If such showings are made to the satisfaction of the Division, additional proofs thereon should then be taken in the proper order and fashion and the items revalued, with the 16% ratio applied to the figures as determined.

The judgments of the Division of Tax Appeals are modified as outlined herein and the matter is remanded to that agency for further action consistent herewith. No costs to any party.

*For modification*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*Opposed*—None.