**RIO ALGOM CORPORATION, a Delaware corporation, et al., Plaintiffs and Appellants,**

v.

**SAN JUAN COUNTY, et al., Defendants and Respondents.**

No. 18782.

Supreme Court of Utah.

March 13, 1984.

James B. Lee, James M. Elegante, Salt Lake City, for plaintiffs and appellants.

Bruce K. Halliday, Monticello, Bill Tomas Peters, Salt Lake City, for defendants and respondents.

STEWART, Justice:

This is an action brought by plaintiffs Rio Algom Corporation, Utah Power and Light Company, Atlas Corporation, Energy Fuels Nuclear, Inc., Consolidated Oil and Gas, Inc., and Northwest Pipeline Corporation against San Juan County and various of its officials, the San Juan School District and various of its employees, and the State Tax Commission and its commissioners for a refund of a part of the property taxes the plaintiffs paid, over protest, to San Juan County for the year 1981.

The plaintiff taxpayers are owners of state-assessed properties located in San Juan County. On this appeal, they challenge the constitutionality of two statutes: (1) U.C.A., 1953, § 59–5–4.5 (Supp.1981), which reduces by 20 percent the value of county-assessed property appraised by comparable sales or cost methods; and (2) U.C.A., 1953, § 59–5–109 (Supp.1981), which rolls back the value of all county-assessed real property to its 1978 level. Plaintiffs contend that the reduction of the assessed value of county-assessed properties, but not state-assessed properties, has unlawfully increased their ad valorem property taxes by requiring them to pay greater taxes to compensate for the reduced taxes that owners of county-assessed properties pay. The plaintiffs' contention is that the two challenged statutory provisions violate, on their face, the tax uniformity and equal protection provisions of the Utah Constitution and the Equal Protection Clause of the Fourteenth Amendment.

## I. AD VALOREM PROPERTY TAXES GENERALLY

U.C.A., 1953, § 59–5–4.5 (Supp.1981) and § 59–5–109 (Supp.1981) were enacted in

1981, Laws of Utah 1981, ch. 231, § 1.[1] Section 59-5-4.5 provides:

Assessor to recognize certain expenses in valuing property—percentage limitation. When the county assessor uses the comparable sales or cost appraisal method in valuing taxable property for assessment purposes, the assessor is required to recognize that various fees, services, closing costs, and other expenses related to the transaction lessen the actual amount that may be received in the transaction. The county assessor, shall, therefore, take 80% of the value based on comparable sales or cost appraisal of the property as its reasonable fair cash value for purposes of assessment.

Section 59-5-109 provides:

All locally-assessed taxable real property shall be appraised at current fair market value and the value of such property rolled back to its January 1, 1978, level as such level is determined by the state tax commission.

In the trial court, the plaintiffs sued for a refund of that portion of their 1981 property taxes which they contend should have been paid by county-assessed property owners in San Juan County who were underassessed pursuant to the above statutes. On a motion for partial summary judgment, §§ 59-5-4.5 and 59-5-109 were attacked as being facially unconstitutional. Plaintiffs adduced no evidence of actual nonuniformity in the tax assessments of state-assessed properties as compared with county-assessed properties. Plaintiffs' argument was that county-assessed properties were not assessed at current market value, and therefore the assessments were unconstitutional as a matter of law. Defendants opposed the motion in part on the ground that the issues could not be adjudicated by summary judgment because of the existence of issues of fact. Defendants submitted evidence indicating that state-assessed properties were undervalued and that the statutes in question were intended by the Legislature to redress a substantial and discriminatory shift of property taxes from state-assessed properties to county-assessed properties. The trial court ruled against the plaintiffs on the motion and held the statutes constitutional. The court held that the statutes were enacted pursuant to the state's constitutional authority to classify property and to establish different methods for valuing different types of property.

The constitutional attack on §§ 59-5-4.5 and 59-5-109 focuses primarily on §§ 2 and 3 of Article XIII of the Utah Constitution. Section 2 of that article as it read in 1981 provided:

All tangible property in the state ... shall be taxed in proportion to its value, to be ascertained *as provided by law.* [Emphasis added.]

Section 3 of Article XIII provides:

The legislature shall provide by law a uniform and equal rate of assessment and taxation on all tangible property in the state, *according to its value in money,* and shall prescribe by law such regulations as shall secure a just valuation for taxation of such property so that every person and corporation shall pay a tax in proportion to the value of his, her, or its tangible property .... [Emphasis added.]

Two other constitutional provisions also deal with the assessment of ad valorem property taxes and are pertinent to this case. Section 4 of Article XIII deals with the taxation of mines and mining claims:

---

1. In its 1982 budget session, the Legislature passed a proposed constitutional amendment that was ratified by the voters in the November 1982 general election and became effective January 1, 1983. The amendment alters Article XIII, § 3 to read:

(1) The Legislature shall provide by law a uniform and equal rate of assessment on all tangible property in the state, according to its value in money, *except as otherwise provided in Section 2 of this Article.* [Emphasis added to show alteration.]

Section 2 was simultaneously amended to allow the Legislature to exempt up to 45 percent of the fair market value of residential property. Article XIII, § 2(8).

The Legislature also repealed § 59-5-4.5 effective as of the same date the constitutional amendment became effective. Laws of Utah 1981, ch. 231, § 1.

All metalliferous mines or mining claims, both placer and rock in place, shall be assessed as the Legislature shall provide; provided, the basis and multiple now used in determining the value of metalliferous mines for taxation purposes and the additional assessed value of $5.00 per acre thereof shall not be changed before January 1, 1935, nor thereafter until otherwise provided by law. All other mines or mining claims and other valuable mineral deposits, including lands containing coal or hydrocarbons and all machinery used in mining and all property or surface improvements upon or appurtenant to mines or mining claims, and the value of any surface use made of mining claims, or mining property for other than mining purposes, shall be assessed as other tangible property.

Section 11 of Article XIII provides that the "State Tax Commission shall administer and supervise the tax laws of the state. It shall assess mines and public utilities .... It shall have such other powers of original assessment as the Legislature may provide."

Pursuant to § 59-5-3 (Supp.1983), the Legislature has directed the Commission to assess the following properties:

Pipelines, power lines and plants, canals and irrigation works, bridges and ferries, and the property of car and transportation companies, when they are operated as a unit in more than one county; all property of public utilities whether operated within one county or more; all mines and mining claims, and the value of metalliferous mines based on two times the annual net proceeds thereof as provided in section 59-5-57, and all other mines and mining claims and other valuable deposits, including lands containing coal or hydrocarbons, nonmetalliferous minerals underlying land the surface of which is owned by a person other than the owner of such minerals, all machinery used in mining and all property or surface improvements upon or appurtenant to mines or mining claims and the value of any surface use made of nonmetalliferous mining claims or mining property for other than mining purposes; must be assessed by the state tax commission as hereinafter provided; except that property assessed by the unitary method, not necessary to the conduct and which does not contribute to the income of the business shall be assessed separately. All taxable property not required by the Constitution or by law to be assessed by the state tax commission must be assessed by the county assessor of the several counties in which the same is situated. For the purposes of taxation all mills, reduction works and smelters used exclusively for the purpose of reducing or smelting the ores from a mine or mining claim by the owner thereof shall be deemed to be appurtenant to such mine or mining claim though the same is not upon such mine or mining claim.

Under this section and its antecedent, the State Tax Commission has assessed the tangible properties of the plaintiffs in this action.

Under Article XIII, § 3, the property taxes paid on each property are required to have a uniform proportion to the value of the property. Although the objective is easily stated, its attainment is more difficult. Because of the many different kinds of property and the various factors that affect their values, the determination of what constitutes equal "in proportion to the value of his, her or its tangible property," under Article XIII, § 3, cannot be made by application of any single formula.

Of primary importance is the determination of what valuation methods should be utilized, and that depends on the nature of the properties to be taxed. Residential, commercial, transportation, mining, and public utilities, etc., must be treated differently because of the economic conditions that give value to such properties. Some properties are income-producing; some are not. Some types of property sell frequently in an open market and have a market value that may be reasonably estimated on

the basis of comparable market sales; some types of property are rarely sold and have no ascertainable market value based on comparable sales. The value of some properties may be strongly influenced by general economic or market conditions, while others are not. Some may be "wasting asset" type properties (such as mines and oil and gas properties), while most are not. Indeed, some properties may have a value that is peculiar to the owner and to no one else. *See Kennecott Copper Corp. v. Salt Lake County*, 122 Utah 431, 250 P.2d 938 (1952) (where the issue was the valuation of a mine dump).

The constitution and laws of the state divide the responsibility for valuation of tangible properties between the State Tax Commission and the county assessors of the respective counties. Article XIII, §§ 5 and 11. County-assessed properties, such as residences and farmland, are assessed on the basis of cost or comparable sales, and commercial enterprises that are county-assessed are usually assessed on a capitalized income method. The Tax Commission utilizes a wide variety of assessment methods and formulae. The basic valuation methods utilized by the Commission are cost, income, and stock and debt. A number of variations of these methods and often substantial discretion are used to modify the basic methods.

The cost method values property on the basis of net book value, which equals original cost less depreciation. That method gives very little effect to the impact of inflation in the assessment process.

Valuations are also made on the income approach. However, its application in a given case may vary. The valuation of large growth companies under this formula, for example, is generally done on the basis of a five-year average of the ratio of the value of assets to net income. The ratios used involve a variety of measures of the value of assets and may include current book value, current net book value, average book value over five years, and average net book value over five years. Different levels of income are used for other companies, and the number of years utilized in the formula may also vary. The decision as to which ratios and how many years to use is based upon the discretion of the appraiser utilizing the approach or the Commission itself.

The stock and debt method is based on the equity and liabilities of the company as shown on its balance sheet. It is applied to value state-assessed properties that are sold so infrequently that the comparable sales method cannot be used. Again, substantial discretion may be exercised by the appraiser in valuing a company on this basis. In addition, the Commission may use the "correlated value" method, which is mentioned below.

Properties owned by utilities are valued by a weighted average of the three basic methods. For example, the properties owned by Utah Power & Light Company and Mountain Fuel Company thus are valued by a formula using 50 percent cost, 45 percent income, and 5 percent stock and debt. The Commission also uses a variant of this formula called the "correlated value" method, by which each of the above factors is given such weight as the judgment of the Tax Commission dictates.

State appraisers, acting under the general direction of the State Tax Commission or a Commissioner, have considerable discretion in determining which method should be utilized in assessing a particular property and the weight to be given to each indicator of value.

Pursuant to U.C.A., 1953, § 59-5-57, the Legislature has provided that metalliferous mines are to be valued at two times the average net annual proceeds for the preceding three calendar years. Nonmetalliferous mines are presently valued by capitalizing net income, using a five-year average, and negative values are taken into consideration. *See* Utah Tax Commission Regulation A12-4-12. Under Tax Commission Property Tax Regulation No. A12-4-10, oil and gas properties are valued "in an amount equal to 80% of the gross realization from the sale of oil or gas which was produced from each such property during

the calendar year prior to the date of assessment."

In sum, the Tax Commission uses a variety of formulae to value properties. However, the formulae used are generally not very sensitive to inflation, especially those formulae based in whole or in part on book value.

Because of the methods used to assess county-assessed properties—especially cost of reproduction and comparable sales, which are highly sensitive to inflation—and because of recent high rates of inflation and the statewide reassessment of county-assessed properties during the 1970s, the assessed valuation of county-assessed properties, especially residential properties, has become disproportionately high to state-assessed properties. From 1971 to 1981, the value of county-assessed properties increased 245 percent, a multiple of slightly less than 3½. During the same time, the value of state-assessed properties increased approximately only 45 percent. Although the total increase in the value of county-assessed properties was undoubtedly not entirely attributable to general inflation, it is a fair inference that a significant part of the increase was. The comparatively small increase in the value of state-assessed properties was no doubt a reflection in part of valuation formulae that gave little effect to inflation. The differences in the effects accorded inflation by the assessment formulae were no doubt substantial factors in producing the disparity between the increases in the value of county-assessed and state-assessed properties. That disparity was the basis for the Legislature's enacting the statutes in question.

In partial support of their position on summary judgment, the defendants submitted the unrebutted affidavit of a deputy Salt Lake County auditor, which stated:

> [O]ver the period from 1971 to 1981 there is demonstrated a trend that shows the continuing disparity in the growth in value of locally assessed property as compared to state assessed property. This disparity and trend has continued in spite of the legislative attempt to curb the

trend by enacting Sections 59–5–4.5 and 59–5–109, Utah Code Annotated, 1953, as amended, 1981. Does the trend result from the regulations, procedures and assessment practices of the Tax Commission? These statistics, on comparison, fail to illustrate any of the contentions put forth by the Plaintiffs as being disadvantaged by the challenged legislation.

## II. THE CONSTITUTIONALITY OF § 59–5–4.5

### A. Sections 2 and 3 of Article XIII of the Utah Constitution

We first address the plaintiffs' contentions that § 59–5–4.5 violates Article XIII of the Utah Constitution, specifically §§ 2 and 3 of that article. The argument is that the statute, in permitting a 20 percent reduction from the comparable sales appraisal or a cost appraisal, is in conflict with the language in § 2 that requires that all tangible property "shall be taxed in proportion to its value" and the language in § 3 that property should be valued "according to its value in money."

This language was construed in *State ex rel. Cunningham v. Thomas*, 16 Utah 86, 50 P. 615 (1897), to mean that property should be valued "as near as is reasonably practicable, at its full cash value; in other words ... the valuation for assessment and taxation shall be, as near as reasonably practicable, equal to the cash value for which the property valued would sell in the open market ...." *Id.* at 90, 50 P. at 615–16. *See also Harmer v. State Tax Commission*, 22 Utah 2d 324, 452 P.2d 876 (1969); *Kennecott Copper Corp. v. Salt Lake County*, 122 Utah 431, 250 P.2d 938 (1952). In particular, the claim is that § 59–5–4.5 is unconstitutional because it permits assessments at other than market value.

An analysis of the constitutionality of § 59–5–4.5 must begin with the proposition that acts of the Legislature are presumed constitutional, especially when dealing with economic matters based on factual assumptions. *Baker v. Matheson*, Utah,

607 P.2d 233 (1979); *Salt Lake City v. Tax Commission,* 11 Utah 2d 359, 359 P.2d 397 (1961). A party attacking the constitutionality of a statute must affirmatively demonstrate its unconstitutionality. *E.g., Stone v. Department of Registration,* Utah, 567 P.2d 1115 (1977); *Salt Lake City v. Tax Commission, supra; Thomas v. Daughters of Utah Pioneers,* 114 Utah 108, 197 P.2d 477 (1948).

■ The presumption of constitutionality applies with particular force to tax statutes. Although we are concerned here with the constitutionality of § 59–5–4.5 under Article XIII of the Utah Constitution, what has been stated by the United States Supreme Court with respect to tax statutes challenged under the Equal Protection Clause of the Fourteenth Amendment is relevant to the instant problem. In *San Antonio School District v. Rodriguez,* 411 U.S. 1, 40, 93 S.Ct. 1278, 1300, 36 L.Ed.2d 16 (1973), the Court stated:

> No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause. [Footnote omitted.]

*See also Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *New York Rapid Transit Corp. v. New York,* 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024 (1938).

Under the Utah Constitution, there is no general constitutional authority for classifying property for assessment purposes. The plain fact is, however, that different types of property cannot be assessed under one formula. Because of the necessity to use different methods for assessing different types of property, a certain degree of de facto classification is unavoidable. Therefore, notwithstanding the basic constitutional objective of uniformity, there are many de facto classifications that re-

sult from the various valuation formulae utilized for estimating market value.

■ Because of the lack of a more precise common denominator than "market value" for use in achieving uniformity and in deference to the inherent difficulties in assessing value, § 3 confers on the Legislature the power to provide by law for just valuations. Accordingly, when dealing with assessments of classes of property, § 3 must be read to permit a necessary latitude in defining "market value." *State ex rel. Cunningham v. Thomas,* 16 Utah 86, 99, 50 P. 615, 618 (1897), the case upon which the plaintiffs heavily rely, recognized as much:

> Because of its dissimilarity, the process by which the judgment [of valuation] is formed must vary, and probably as to all property, except money, perfect equality in valuations and assessments is unattainable, owing to the fallibility of the human judgment.

The point was made even more clearly in *United States Smelting, Refining & Mining Co. v. Haynes,* 111 Utah 172, 181, 176 P.2d 622, 627 (1947):

> It will be observed that these provisions [§§ 2 and 3 of Article XIII] require that all tangible property ... shall be subjected to a uniform and equal rate of assessment according to its value in money. The method or yardstick by which the valuation in money is to be determined shall be prescribed by the legislature. It is not required that the same yardstick or method of determining value shall be used with respect to all kinds of property. But the different formulae which may be applied to different kinds of property must be such that they aim and tend to secure for assessment purposes a valuation fair and equitable in comparison with and commensurate with the valuation of other kinds of property. When the valuation thus secured is such that if the uniform and equal rate of taxation is applied to the valuation the property is taxed in the same proportion to its value as is all other tangible property, the method of arriving at the as-

sessed valuation is not subject to constitutional objections as violative of our Article XIII.

Thus, §§ 2 and 3 of Article XIII permit the Legislature to adopt means to achieve that degree of uniformity in valuation that is practicably attainable within the general confines of the term "market value." The objective is to assure that the taxes that are levied in a given county will result in each property's being "accountable for its pro rata share of the burden of local government." *Appeal of Johnstown Associates*, 494 Pa. 433, 438, 431 A.2d 932, 934 (1981). *Accord Kenney v. Keebler Co.*, 53 Pa.Commw. 507, 419 A.2d 210 (1980).[2]

■ Plaintiffs contend that a reduction in the value of county-assessed properties by 20 percent demonstrates on its face an unconstitutional discrimination in favor of county-assessed properties. However, the plaintiffs have not attempted to demonstrate by affidavit or otherwise that their own properties are assessed at market value or that they bear a tax burden greater than their pro rata share of the property taxes in San Juan County. Nor have they demonstrated that the deduction of "transaction costs" from comparable sales figures or estimates of cost as permitted by § 59–5–4.5 defeats the constitutional objective of establishing "a valuation [that is] fair and equitable in comparison with and commensurate with the valuation of other kinds of property." *United States Smelting, Refining & Mining Co. v. Haynes, supra,* 111 Utah at 181, 176 P.2d at 627.

Nor have the plaintiffs demonstrated that § 59–5–4.5 is not consistent with the constitutional requirement that properties be valued at market value. *See State ex rel. Cunningham v. Thomas, supra.* In-

deed, *Thomas* itself recognizes that the term "market value" is a term that cannot be applied in an overly rigid fashion.

The numerous formulae used to determine market value demonstrate that the term is a judgment not subject to mathematical precision that is based on a wide variety of factors:

"Market value," the basis for all assessment valuation, is an attempt to create a fictitious sale of the subject property by assuming an owner willing to sell and a buyer desiring to buy. When, as in the instant case, there is no actual buyer desiring to purchase the property for continuation of its special use, the property's highest and best use as a special purpose property must still be considered for valuation purposes. The very nature of special purpose property is such that market value cannot readily be determined by the existence of an actual market, and therefore other methods of valuation, such as reproduction cost, must be resorted to.

*Matter of McCannel*, Minn., 301 N.W.2d 910, 924 (1980). *Accord United National Corp. v. County of Hennepin*, Minn., 299 N.W.2d 73, 76 (1980).

Even when there are sales of the type of property to be assessed, it is still the case that the term "market value" is at best an approximation. In *United National Corp. v. County of Hennepin, supra,* 299 N.W.2d at 76, n. 4, the court stated:

Market value and sales price are not synonymous. Although recent sales of properties of a similar nature are persuasive in determining market value, factors such as sales and holding prices in the area, location, access, age, use, size,

---

**2.** Property tax schemes that specifically allow classifications are designed, in part, to spread the tax burden on the ability of property to produce income. In *Yellowstone Pipe Line Co. v. State Bd. of Equalization*, 138 Mont. 603, 358 P.2d 55, 64 (1960), the court stated:

The purpose of the classification statute ... is "to shift the burden of taxes from property, as such, to productivity, or, in other words, to impose the burdens of government upon property in proportion to its use, its produc-

tivity, its utility, its general setting in the economic organization of society, so that every one will be called upon to contribute according to his ability to bear burdens, or as nearly so as may be ...." [Citation omitted.]

*See also Apache County v. Atchison, Topeka & Santa Fe Ry.*, Ariz., 476 P.2d 657 (1970). The Utah Constitution does not permit classifications as such, except to the extent that Article XIII, § 2 permits special treatment of residential properties.

type of construction, method of financing and the arm's length nature of a transaction may render any comparisons invalid. In *Matter of McCannel, supra,* 301 N.W.2d at 922, the court phrased the point in a somewhat different manner: "Although selling price is usually a good indicator of market value if the sale is an arm's length transaction between parties with equal bargaining power, the terms or conditions of a sale may affect the selling price and make it unrepresentative of the property's actual value." *See also Minnesota Entertainment Enterprises v. State,* 306 Minn. 184, 187, 235 N.W.2d 390, 392–93 (1975); *Deitch Co. v. Board of Property Assessment,* 417 Pa. 213, 218, 209 A.2d 397, 402 (1965).

■ Since "market value" is not a term having a wholly fixed and precise meaning, it is reasonable and constitutionally permissible for the Legislature to recognize that "transaction costs" can and do influence values computed on actual sales prices, as well as other valuation formulae, to provide that they may be taken into account in determining market value. That conclusion is supported by the language in Article XIII, § 2 that gives the Legislature some power to define value. (Since there is no claim in this case that the *amount* of the transaction costs provided for in § 59–5–4.5 is factually arbitrary, the reasonableness of the amount of those costs is in effect conceded.)

■ Furthermore, the Legislature was justified in enacting § 59–5–4.5 for another reason. The Legislature acted on the premise that the then-existing property tax scheme in the state was discriminatory because it required county-assessed taxpayers to shoulder an unfair portion of the taxes and violated the requirement of uniformity. The Legislature was well aware, as the legislative history of both challenged acts unequivocally demonstrates, that there had been a large shift of the property tax burden from state-assessed properties to county-assessed properties as a result of inflation. In part, the problem arose out of the statewide reappraisal program, which had the effect of immediately injecting a high degree of inflation into residential values. In contrast, the formulae used to assess state-assessed properties did not tend to factor the effects of inflation into the state-assessed properties, or if they did, they did so at a much more modest and less abrupt pace. When inflation has a significant and differing effect on the value of properties, the Legislature may redress the imbalances and inequities created. *Northern Natural Gas Co. v. Williams,* 208 Kan. 407, 493 P.2d 568 (1972); *Supervisor of Assessments v. Otremba,* 50 Md.App. 608, 440 A.2d 403 (1982).

The Legislature's factual premise that state valuation and county valuation were not uniform has not been attacked.[3] Defendants filed affidavits with the Court on the cross-motions for summary judgment that lend some support to the factual proposition that there is a significant lack of uniformity. Even without the defendants' evidence, however, we would still be obliged to presume that there is a valid factual basis for the challenged statute. *See Matter of McCannel, supra,* 301 N.W.2d at 916; *Elwell v. Hennepin County,* 301 Minn. 63, 221 N.W.2d 538 (1974).

■ Certainly the Legislature may not establish formal classifications of property that result in nonuniform or disproportionate tax burdens. But the Legislature may seek to enforce the uniformity requirement of § 3 by attempting to equalize the tax burden borne by those taxpayers who pay a greater tax in proportion to the value of their property than others. In permitting transaction costs to be deducted from appraisals based on comparable sales or cost appraisal method, the Legislature has neither departed from the "cash value" requirement of Article XIII, § 3, nor gone beyond its constitutional duty to "prescribe by law such regulations as shall secure a

**3.** In response to the plaintiffs' request for admissions, the Tax Commission denied that all property under its jurisdiction was assessed at its current fair cash value and further denied that the plaintiffs' property was assessed at 100 percent of the current fair cash value.

just valuation for taxation." *Id.* Clearly, the statute is not based on a plan or a principle designed to violate equality and uniformity. *Denver v. Lewin,* 106 Colo. 331, 105 P.2d 854 (1940).

The overarching purpose of §§ 2 and 3 of Article XIII is to achieve uniformity in the ad valorem taxing scheme. The definition of value is one element in a formula designed to achieve that end by establishing a common denominator for valuation purposes. The law has long been that where "it is impossible to achieve both the standards of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." *Delaware, Lackawanna & Western Railroad v. Neeld,* 23 N.J. 561, 570, 130 A.2d 6, 11 (1957), *quoting Sioux City Bridge Co. v. Dakota County,* 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923).

> To assess property at its just value is only one of the fundamental requirements of law. The assessment must further represent the owner's equal portion of the burden of taxation, and if the assessors have not appraised at full value but only at a fixed percentage of true value, then such treatment must be uniform and equal on all real estate and tangible property, so much so that if both cannot be obtained then equality must prevail.

*Kittery Electric Light Co. v. Assessors of the Town of Kittery,* Me., 219 A.2d 728, 734 (1966).

In the instant case, the Legislature might have dealt with the problem of uniform taxation by requiring adjustments in the formulae used by the State Tax Commission to assess state-assessed properties. As a practical matter, the Legislature may well have decided not to attempt that approach because of the complexity and difficulty of having to deal with so many different kinds of formulae for assessing market value. By acting as it did, the Legislature acted neither unconstitutionally nor unreasonably.

Accordingly, we hold that § 59–5–4.5 was constitutional under Article XIII.

**B.** *Equal Protection and Uniform Operation of the Laws*

■ Equal protection provisions of the federal and state constitutions accord particularly wide latitude to legislative classifications in tax statutes. *Apache County v. Atchison, Topeka & Santa Fe Railway,* 106 Ariz. 356, 476 P.2d 657 (1970). "No scheme of taxation," whether property, income or otherwise, "has yet been devised which is free of all discriminatory impact." *San Antonio School District v. Rodriguez,* 411 U.S. 1, 41, 93 S.Ct. 1278, 1301, 36 L.Ed.2d 16 (1973). In *Nashville, Chattanooga & St. Louis Railway v. Browning,* 310 U.S. 362, 368, 60 S.Ct. 968, 971, 84 L.Ed. 1254 (1940), the Supreme Court stated:

> This Court has previously had occasion to advert to the narrow and sometimes cramping provision of these state uniformity clauses, and has left no doubt that their inflexible restrictions upon the taxing powers of the state were not to be insinuated into that meritorious conception of equality which alone the Equal Protection Clause was designed to assure.

■ In sum, § 59–5–4.5 does not violate the equal protection provisions of the state and federal constitutions.

### III.   CONSTITUTIONALITY OF § 59–5–109

U.C.A., 1953, § 59–5–109 (Supp.1981) provides that all "locally-assessed real property shall be appraised at current fair market value and the value of such property rolled back to its January 1, 1978 level." Article XIII of the Utah Constitution authorizes ad valorem property taxes. The term "ad valorem tax" means literally "according to its value" and is used to designate an assessment of taxes against property at a certain rate on its value. *Powell v. Gleason,* 50 Ariz. 542, 74 P.2d 47 (1937).

A critical factor in establishing assessments that represent reasonably accurate approximations of value is time. Virtually all factors that influence value vary with time. An ad valorem tax system must, therefore, be based on periodic reassessments that take into consideration the fluctuating factors that affect value. To freeze the value of some properties at a given point in time, and not others, must necessarily result in nonuniform assessments. In *Moon Lake Electric Association v. State Tax Commission,* 9 Utah 2d 384, 345 P.2d 612 (1959), this Court held unconstitutional a statutory formula that fixed the assessment of a property for ad valorem tax purposes. The Court stated: "The effect of these [statutory] sections is nothing, unless it prevents the accurate assessment of property in a given case to its full value. The conflict with the constitution is clear." *Id.* at 387, 345 P.2d at 614. That is precisely the difficulty with the roll-back statute. It necessarily follows that an indefinite, partial freeze on the valuation of some properties in the state is inherently inconsistent with the basic concept of an ad valorem tax system. Inevitably, the statute would produce valuations that are not based on market value and that are in violation of the principle of uniformity.

We recognize that § 59–5–109 was enacted to redress a disparity between assessments of state-assessed and county-assessed properties. But if the constitution is to be changed to adjust for some inequity, the people must make that change by constitutional amendment.

In sum, the fixing of base-line assessments of county-assessed real properties as of a given year in the past, *see Utah Hotel Co. v. Yorgason,* Utah, 659 P.2d 1056 (1983), is a violation of Article XIII, §§ 2 and 3 and is unconstitutional.

## IV. PROSPECTIVE AND RETROACTIVE EFFECTS

Defendants argue that if either of these statutes is found unconstitutional then the Court should make its ruling prospective only, as we did in overruling prior decisions in *Loyal Order of Moose No. 259 v. County Board,* Utah, 657 P.2d 257 (1982). Otherwise, defendants maintain, local governments will be subject to enormous financial and administrative burdens. Taxing districts throughout the state have relied on the provisions of these statutes in setting their mill levies for 1981 through 1983. Local governments operate on very precise and often strained budgets that are carefully tied to these levies. Since 1981, a number of owners of state-assessed properties have paid their taxes under protest or have filed formal complaints with the Tax Commission. Retroactive effect to a decision altering the relative tax burdens between locally assessed and state-assessed properties would require reopening the assessment process as to tax obligations not yet final. To the extent that this might result in refunds of taxes paid on state-assessed properties, it would impose indebtedness for future repayments from locally assessed properties. Such indebtedness could be huge in counties that derive high proportions of their budgets from state-assessed properties.

The purely prospective application of a state court decision overruling prior authority in a civil case violates no right under the United States Constitution. *Great Northern Railway v. Sunburst Oil & Refining Co.,* 287 U.S. 358, 53 S.Ct. 145, 77 L.Ed. 360 (1932). (The prospective or retroactive effect of decisions in criminal cases involves a different range of consideration and is neither precedent for, nor should be deemed influenced by, what is done in civil cases. *Compare State v. Norton,* 675 P.2d 577 (1983).) In recent years, the United States Supreme Court has on several occasions held civil legislation unconstitutional and then given only prospective effect to its holding in order to avoid imposing undue administrative or financial burdens on agencies of local government. *E.g., Lemon v. Kurtzman,* 411 U.S. 192, 93 S.Ct. 1463, 36 L.Ed.2d 151 (1973); *City of Phoenix v. Kolodziejski,* 399 U.S. 204, 90

S.Ct. 1990, 26 L.Ed.2d 523 (1970); *Cipriano v. City of Houma*, 395 U.S. 701, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969). The prospective effect the Court gave to its holding on the unconstitutionality of the broad jurisdiction of bankruptcy courts is another example. *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982).

Similarly, in cases holding that state taxes or assessment procedures were unconstitutional, numerous state courts have directed that their holdings should have only prospective effect. *E.g., Southern Pacific Co. v. Cochise County*, 92 Ariz. 395, 377 P.2d 770 (1963); *Deltona Corp. v. Bailey*, Fla., 336 So.2d 1163 (1976); *Strickland v. Newton County*, 244 Ga. 54, 258 S.E.2d 132 (1979); *Kansas City Millwright Co. v. Kalb*, 221 Kan. 658, 562 P.2d 65 (1977); *Jacobs v. Lexington-Fayette Urban County Government*, Ky., 560 S.W.2d 10 (1977); *Salorio v. Glaser*, 93 N.J. 447, 461 A.2d 1100 (1983); *Soo Line Railroad v. State*, N.D., 286 N.W.2d 459 (1979); *Perkins v. County of Albermarle*, 214 Va. 416, 200 S.E.2d 566 (1973); *Gottlieb v. City of Milwaukee*, 33 Wis.2d 408, 147 N.W.2d 633 (1967).

These state decisions rely on the need to preserve the financial solvency of local government units, the great financial and administrative hardship that would be entailed if general retroactive effect were allowed, and the tax authorities' justifiable reliance on the statute, which is presumptively constitutional. To the objection that an unconstitutional act is void from its inception so that everything done thereunder must be undone, the New Jersey Supreme Court cited the importance of recognizing "that we are acting within the framework of appropriate equitable relief with respect to an unconstitutional taxation statute." *Salorio v. Glaser*, 93 N.J. at 563, 461 A.2d at 1108. In fashioning an equitable remedy, reliance interests weigh heavily, and the court should seek a blend of what is necessary, what is fair, and what is workable. *Id.* at 564, 461 A.2d at 1109, relying on the opinion of Chief Justice

Burger in *Lemon v. Kurtzman, supra.* We relied on these same considerations in directing purely prospective effect (from a future date) to our overruling decision in *Loyal Order of Moose No. 259, supra.*

On the basis of the circumstances of this case, the foregoing considerations and authorities persuade us of the appropriateness of prospective effect to our holding that § 59–5–109 is unconstitutional.

One of the criticisms of giving only prospective effect to a decision is that it turns the court's opinion into an advisory opinion or dicta. It also deprives the litigants, who have sustained the burden of attacking an unconstitutional statute, of the fruits of their victory. For this reason, prospective effect may even discourage challenges to statutes of questionable validity. In response to these considerations, some decisions that give only prospective effect to a holding of unconstitutionality as to all other parties give the holding retroactive effect as to the litigants or others who have litigation pending. *Strickland v. Newton County, supra* (Ga.—parties only); *Kansas City Millwright Co. v. Kalb, supra* (Kan.—parties and others with action pending); *Perkins v. County of Albermarle, supra* (Va.—parties only). *See generally* Schaefer, "Prospective Rulings: Two Perspectives," *1982 Supreme Court Review* 1, 6; Schaefer, "The Control of 'Sunbursts': Techniques of Prospective Overruling," 42 *N.Y.U.L.Rev.* 631, 638–40 (1967). We gave this kind of limited retroactive effect to a decision that local government legislation was unconstitutional, a decision that was otherwise prospective only. *Carter v. Beaver County Service Area No. One*, 16 Utah 2d 280, 283, 399 P.2d 440, 442 (1965).

■ For the same reasons that motivated the foregoing decisions, we direct that our holding of unconstitutionality be prospective and effective only from and after January 1, 1984. As to the six plaintiff-taxpayers who are parties to this appeal, however, this decision shall be retroactive for the year for which this suit for refund was brought.

## V. PROCEEDINGS ON REMAND

Having concluded that § 59–5–109 is unconstitutional, it is appropriate to state the guidelines that should be applied in determining what relief may be granted on remand.

■ For the plaintiffs to recover an alleged overpayment of taxes paid under protest on the ground that § 59–5–109 caused a shift in the tax burden to their properties, plaintiffs must prove two elements. First, the plaintiffs must demonstrate that the county-assessed properties were appraised at less than their 1981 true values. Second, the plaintiffs must establish by independent evidence the true value of their own properties, and the appraisal used must give due effect to the same economic factors as the formulae used to value the county-assessed properties. *Reading Co. v. Woodbridge*, 45 N.J. 407, 426, 212 A.2d 649, 659–60 (1965); *In re Appeals of Kents*, 34 N.J. 21, 33, 166 A.2d 763, 769–70 (1961); *Tri-Terminal Corp. v. Edgewater*, 68 N.J. 405, 412, 346 A.2d 396, 400 (1975); *Fort Lee v. Hudson Terrace Apartments*, 175 N.J.Super. 221, 236, 417 A.2d 1124, 1132 (1980); *Anaconda Co. v. Perth Amboy*, 157 N.J.Super. 42, 53–54, 384 A.2d 531, 536–37 (1978).

■ Although there usually is a presumption that property assessed by a state or county assessor has been appraised at full value, the presumption applies only when a taxpayer challenges the valuation of his own property and not when he challenges the appraised value of another's property. *E.g., State ex rel. Stephan v. Martin*, 227 Kan. 456, 463, 608 P.2d 880, 887 (1980); *Reading Co. v. Woodbridge*, 45 N.J. at 429, 212 A.2d at 661. To extend that presumption to plaintiffs' properties in this case would conflict with the implied legislative finding that state-assessed properties were under-assessed. It would also conflict with the Tax Commission's admission that plaintiffs' properties are not valued at full value.[4] To presume that plaintiffs' properties are assessed at full value

under these circumstances could well be contrary to fact and could result in enhancing the inequality the Legislature sought to redress. *See Reading Co. v. Woodbridge, supra,* 212 A.2d at 660.

■ If plaintiffs prove both elements, they may recover the difference between the amount of taxes they. paid and the amount they would have paid if § 59–5–109 had not been in effect. *See First National Bank v. Christensen*, 39 Utah 568, 577–78, 118 P. 778, 781 (1911); *Continental National Bank v. Naylor*, 54 Utah 49, 58, 179 P. 67, 71 (1919). If the plaintiffs' properties were appraised at less than full value, they will be entitled to what they would have paid had § 59–5–109 not been in effect, less the amount they underpaid their taxes because their properties were under-assessed.

The case is affirmed in part, reversed in part, and remanded for further proceedings. No costs.

OAKS and DURHAM, JJ., concur.

HOWE, Justice (concurring):

I concur except in the application in part II(A) of the principle that "where it is impossible to achieve both the standard of the true value, and the uniformity and equality required by law, the latter requirement is to be preferred as the just and ultimate purpose of the law." That principle apparently originated in *Sioux City Bridge Co. v. Dakota County*, 260 U.S. 441, 43 S.Ct. 190, 67 L.Ed. 340 (1923), where that Court relied upon it to justify its departure from a statute requiring property to be valued at its fair market value in order to comply with a constitutional mandate that there be uniformity and equality of taxation. By applying the principle, the Court was able to afford relief to a taxpayer whose property had been assessed at full fair market value, while other properties in the county had been assessed at only 55%. The principle was applied under similar circumstances in *Delaware, Lackawanna & Western Railroad v. Neeld*, 23 N.J.

---

4. *See* n. 3 *supra.*

561, 130 A.2d 6 (1957) cited in the main opinion.

In the instant case, however, valuation at fair market value is mandated by article XIII, sections 2 and 3 of the Utah Constitution, and its requirements cannot be relaxed in an effort to obtain uniformity and equality also mandated by section 3. In the context of this case, the principle can have no application.

HALL, Chief Justice (concurring and dissenting):

I join the Court in declaring the roll-back provisions of U.C.A., 1953, § 59–5–109 (Supp.1981) unconstitutional on their face. However, for the same reasons, I also view as unconstitutional on their face the provisions of U.C.A., 1953, § 59–5–4.5 (Supp. 1981), which reduce the value of taxable real property assessed by the counties by 20%.

Article XIII, sections 2 and 3 of the Constitution of Utah in unequivocal language require that all non-exempt tangible property, both real and personal, be assessed at a "uniform and equal rate," and that it be assessed and taxed "according to its value in money."

This Court has long heretofore interpreted the term "according to its value in money" as the full cash value of the property.[1] Also, the term "full cash value" has been determined to be synonymous with the terms "actual cash value," "market value," "reasonable fair cash value" and "value in money."[2]

It is thus to be seen that § 59–5–4.5 is unconstitutional on its face in that it directs the county assessor to assess and tax county-assessed property at 80% of its "reasonable fair cash value" rather than at 100% of its value. This is precisely the sort of inequality and lack of uniformity that violates the express provisions of article XIII, sections 2 and 3, *supra.*

The defendants recite the legislative history of the subject statute, which reflects that a disparity was found to exist in the valuation of county-assessed and state-assessed property. The disparity was apparently occasioned by the different valuation methods employed by the state and the counties. The counties generally utilized a comparable sales method that readily reflected the effect of inflation upon market value. However, the state continued to inflexibly follow its usual cost, income, stock and debt approaches to market value and failed to in any way compensate for the effects of inflation. This caused considerable consternation on the part of county assessors who were compelled to assess the property of their constituents at sharply increasing values while state assessments lagged far behind. It was to relieve this inequity in assessment that the Legislature enacted the subject statutes. However well-intentioned the legislative enactments were, they nevertheless do not meet constitutional muster.

Article XIII, section 3, *supra,* confers upon the Legislature the obligation and duty to "provide by law a uniform and equal rate of assessment and taxation" and to "prescribe by law such regulations as shall secure a just valuation for taxation of such property." However, that authority must be read in light of the overriding concept espoused by the constitution, i.e., that all property be assessed at a "uniform and equal rate," and that it be taxed "according to its value in money." The case of *United States Smelting, Refining & Mining Co. v. Haynes,*[3] relied upon by the defendants does not hold to the contrary. Rather, it is supportive of this basic proposition. This is to be seen in that no matter which method or yardstick the Legislature chooses to determine the valuation of property in *money,* the end result that must be achieved is just that, i.e., "according to its value in money."

1. *State v. Thomas,* 16 Utah 86, 50 P. 615 (1897).

2. *Kennecott Copper Corp. v. Salt Lake County,* 122 Utah 431, 250 P.2d 938 (1952).

3. 111 Utah 172, 176 P.2d 622 (1947).

Viewed in light of what has just been said, the subject legislation causes state-assessed and county-assessed property to be assessed at *unequal* rates and at values other than *actual market value.* Furthermore, the legislation tends to compound rather than alleviate the problem of disparity in assessed valuation. This it does by leaving in place and thereby sanctioning the erroneous assessment practices of the state that fail to assess property according to its actual value. Rather than legislating so as to insure that the assessment practices of the state be revamped so as to bring them in conformity with constitutional mandate, the legislation directs the county assessor to also violate the constitution by assessing property at a rate 20% less than *actual value.*

I would reverse the decision of the trial court in its entirety.