**BOARD OF EQUALIZATION OF
SALT LAKE COUNTY, State
of Utah, Petitioner,**

v.

**UTAH STATE TAX COMMISSION
ex rel. BENCHMARK, INC.,
Respondents.**

No. 910310.

Supreme Court of Utah.

Nov. 18, 1993.

David E. Yocom and Bill Thomas Peters, Salt Lake City, for petitioner.

R. Paul Van Dam, Atty. Gen. and Leon A. Dever, Asst. Atty. Gen., for the Com'n.

Robert A. Peterson, Salt Lake City, for Benchmark.

HOWE, Associate Chief Justice:

The Board of Equalization of Salt Lake County seeks review of a final order of the Utah State Tax Commission determining the fair market value of 44 residential building lots owned by Benchmark, Inc., for purposes of ad valorem taxation.

## FACTS

Benchmark is the owner and developer of Benchmark Subdivision located on the east side of Foothill Boulevard in Salt Lake City overlooking Interstate Highway 80. The subdivision consists of 118 lots, 74 of which Benchmark had previously sold to individual purchasers. For the years 1987, 1988, and 1989, the Salt Lake County Assessor used the comparable sales method to value the remaining 44 lots. The assessment of each lot was based on its retail value—its value if "sold on the open market." The

retail value is not in serious dispute.[1] The Board of Equalization upheld the assessment.

Benchmark appealed to the Commission, contending that the retail value of the lots should be discounted to allow for an absorption period. As with any developer, Benchmark invested capital in the subdivision lots fully expecting to sell them over an extended period of time. As a practical matter, it is highly unlikely that all of the lots can be sold in a single tax year if sold individually. By determining the rate at which the lots will sell per year and discounting to present value the amount those future sales will yield, absorption valuation recognizes the time value of such an investment in multiple lots. The absorption period represents the number of years it will take Benchmark to sell all of the remaining 44 lots. In addition, absorption valuation recognizes the existence of certain transactional and holding costs incurred by a developer during the absorption period and deducts them from the retail value of the lots. These costs include marketing commissions, closing costs, real estate taxes, and other miscellaneous expenses, i.e., maintenance and weed control. Finally, it should be noted that absorption valuation, unlike the comparable sales method, yields the fair market value of the 44 subdivision lots if they are all sold together. The method contemplates a "hypothetical sale in bulk from one developer to another."

Howard Layton, an MAI appraiser who had appraised the lots in question for Benchmark, testified at the hearing before the Commission. Based on his appraisal, Layton outlined six steps to determine the value of property according to the absorption method:

1. Estimate the retail value/price of the proposed subject lots.

2. Estimate the sales performance or absorption time, including positive or negative change in price over time.

3. Estimate the costs incurred during the marketing or holding period.

1. The board appraisal and the Benchmark appraisal of the retail value of the lots are "less than five percent different plus or minus for each of the three years."

4. Estimate the proper entrepreneurial profit ... necessary to attract a person to be willing to purchase the subdivision or group of lots.

5. Determine an appropriate discount rate.

6. [P]roject the cash flow over the marketing period and discount the net cash flow to a single present dollar value estimate.

The Commission found that Benchmark's projected absorption period, eight years, was reasonable and that "the value of a lot sold today for a given price is greater than the value of a lot sold years into the future for the same price." Following its prior decisions, the Commission fixed the value of the lots according to the absorption method of appraisal, concluding that "for property which contains a number of parcels too numerous to be sold at fair market value within one year, an absorption adjustment must be made to allow for the time value of the investment in the property."

The Board appeals from the Commission's determination. The issue before us is whether applying an absorption discount to the lots in question is consistent with the Utah Constitution and with the Utah statutory scheme for ad valorem taxation.

## STANDARD OF REVIEW

The legislature recently codified the standard of review to be applied by this court when reviewing formal adjudicative proceedings before the state tax commission. Utah Code Ann. § 59–1–610(1) (Supp.1993). This section became effective on May 3, 1993, and "supersede[d] section 63–46b–16 pertaining to judicial review of formal adjudicative proceedings." § 59–1–610(2). Although this action commenced before the effective date, we find that section 59–1–610(1) applies.

■ We held in *Pilcher v. Department of Social Services,* 663 P.2d 450 (Utah 1983), that "procedural statutes enacted subsequent to the initiation of a suit which do not enlarge, eliminate, or destroy vested or contractual rights apply not only to future actions, but also to accrued and pending actions as well." *Id.* at 455. Standard of review is "a matter of procedural, rather than substantive, law," *State v. Thurman,* 846 P.2d 1256, 1267 (Utah 1993), and section 59–1–610 does not "enlarge, eliminate or destroy" the vested or contractual rights of any party to this case. Therefore, section 59–1–610 governs our review in this case. *OSI v. Utah State Tax Comm'n,* 860 P.2d 381 (Utah Ct.App.1993) (using this reasoning to apply section 59–1–610 retroactively).

■ The Commission's decision raises questions of law. Section 59–1–610 provides that we "grant the commission no deference concerning its conclusions of law, applying a correction of error standard, unless there is an explicit grant of discretion contained in a statute at issue before the appellate court." Utah Code Ann. § 59–1–610(1)(b) (Supp.1993). No discretion has been granted to the Commission in interpreting the state constitution or the statutes relevant to this case. Therefore, the "no deference" standard applies. In short, the Commission's experience and expertise is "of no real assistance" in resolving questions of constitutional law and statutory construction. *Zissi v. State Tax Comm'n,* 842 P.2d 848, 853 n. 2 (Utah 1992).

## CONSTITUTIONAL ANALYSIS

Article XIII, section 2(1) of the Utah Constitution provides:

All tangible property in the state, not exempt under the laws of the United States, or under this Constitution, shall be taxed at a uniform and equal rate in proportion to its value, to be ascertained as provided by law.

Section 3 of the same article provides in part:

The Legislature shall provide by law a uniform and equal rate of assessment on all tangible property in the state according to its value in money.... The Legislature shall prescribe by law such provisions as shall secure a just valuation for taxation of such property, so that every person and corporation shall pay a tax in

proportion to the value of his, her, or its tangible property.

■ These two sections expressly require that property be taxed according to "its value" and "its value in money." In *State ex rel. Cunningham v. Thomas*, 16 Utah 86, 90, 50 P. 615, 615–16 (1897), we construed this language to mean that property should be valued "as near as is reasonably practicable, at its full cash value; in other words, the valuation for assessment and taxation shall be, as near as is reasonably practicable, equal to the cash price for which the property valued would sell in the open market." Utah Code Ann. § 59–2–102(7) defines "fair market value" as the "amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts."

■ Despite these judicial and statutory definitions, "market value" remains a fluid standard. For this reason, section 3 of article XIII "confers on the Legislature power to provide for just valuations." *Rio Algom Corp. v. San Juan County*, 681 P.2d 184, 191 (Utah 1984). As interpreted, section 3 allows the legislature considerable latitude in the methods or formulae used to determine "market value." *Id.* We wrote in *United States Smelting, Refining, & Mining Co. v. Haynes*, 111 Utah 172, 176 P.2d 622 (1947): .

It will be observed that these provisions [sections 2 and 3 of article XIII] require that all tangible property ... shall be subjected to a uniform and equal rate of assessment according to its value in money. The method or yardstick by which the valuation in money is to be determined shall be prescribed by the legislature. It is not required that the same yardstick or method of determining value shall be used with respect to all kinds of property. But the different formulae that may be applied to different kinds of property must be such that they aim and tend to secure for assessment purposes a valuation fair and equitable in comparison with and commensurate with valuation of other kinds of property.

*Id.* at 181, 176 P.2d at 627.

■ Discounts from fair market or cash value are not unconstitutional per se. *See* Utah Code Ann. § 59–2–304(1) (1992). However, to pass constitutional muster, a discount must be applied uniformly and equally to all property assessed according to the same method of appraisal. Otherwise, the burden of taxation is not shared in proportion to the value of property owned. Utah Const. art. XIII, §§ 2, 3. To clarify the application of this rule, we must examine in detail two of our prior decisions.

In *Rio Algom Corp.*, the plaintiffs, owners of state-assessed properties, challenged the constitutionality of the statutory discount in Utah Code Ann. § 59–5–4.5 (1981) (current version at Utah Code Ann. § 59–2–304). This provision discounted by 20 percent the value of all county-assessed property appraised by the comparable sales or the cost method. The discount represented "various fees, services, closing costs, and other expenses related to the transaction" which lessen the actual amount that may be received from a sale of property.

Transactional "expenses" aside, however, the primary purpose of section 59–5–4.5 was to restore uniformity to the taxation of state- and county-assessed properties. County-assessed properties are generally assessed according to the comparable sales or the cost method of valuation. *Rio Algom Corp.*, 681 P.2d at 189. These methods are extremely sensitive to inflation. State properties, on the other hand, are assessed according to several alternative methods that are less sensitive. As a result of inflation, "from 1971 to 1981, the value of county-assessed properties increased 245 percent," while the value of state-assessed properties "increased approximately only 45 percent." *Id.* at 190. This overvaluation forced county property owners to shoulder a disproportionate share of the tax burden in comparison to the actual value of their property. To counterbalance the overvaluation, the legislature enacted section 59–5–4.5, which allowed for a 20 percent reduction from the

market value of all county-assessed property.

The plaintiffs in *Rio Algom Corp.* argued that "the reduction of the assessed value of county-assessed properties, but not state-assessed properties, [had] unlawfully increased [their] ad valorem property taxes by requiring [them] to pay greater taxes to compensate for the reduced taxes that owners of county-assessed properties pay." 681 P.2d at 186. We rejected this argument for three reasons. First, the plaintiffs did not demonstrate that their own properties had been assessed according to market value like the county properties. *Id.* at 192. Second, they did not show that they bore "a tax burden greater than their pro rata share of the property taxes in San Juan County." *Id.* Third, the plaintiffs did not demonstrate that "the deduction of 'transaction costs' from comparable sales figures and estimates of cost as permitted by section 59–5–4.5 defeats the constitutional objective of establishing 'a valuation [that is] fair and equitable in comparison with and commensurate with the valuation of other kinds of property.'" *Id.* (quoting *United States Smelting, Ref., & Mining Co.*, 111 Utah at 181, 176 P.2d at 627).

Unlike the county- and state-assessed properties in *Rio Algom Corp.*, all the lots in Benchmark Subdivision were assessed by the county according to the same method of appraisal (comparable sales). The Commission then granted Benchmark a discount to reflect the value of its investment in multiple lots over time. This discount was not available to single lot owners assessed by the county. In light of this distinguishing fact, our decision in *Amax Magnesium Corp. v. Tax Commission*, 796 P.2d 1256 (Utah 1990), is more germane to the facts before us.

In *Amax Magnesium Corp.*, the state tax commission assessed Amax at "100 percent of the current fair cash value" using the "same market value method of assessment used by county assessors." *Id.* at 1260. However, the commission refused to apply the 20 percent reduction under section 59–5–4.5 reserved for county-assessed properties. Amax argued that "by requiring the State to assess property at 100 percent of value and the county to assess property at 80 percent of value, the legislature had created a law that violates sections 2 and 3 of article XIII of the Utah Constitution." *Id.* at 1259. We held that because the properties had been assessed by the same method, applying the 20 percent discount to one and not to the other violated the constitutional requirement of uniform and equal taxation. In reaching this conclusion, we explained:

> The only reason Amax's property is assessed at 100 percent of value rather than at 80 percent is that Amax's property is required ... to be taxed as state-assessed property.
>
> It strains reason to assert that if assessors using the cost and market appraisal methods overvalue county properties, the same overvaluation would not occur with state properties appraised by the same methods. Assuming that the legislature was correct in determining that the market value appraisal method overvalues property by 20 percent, it would be unconstitutional to apply section 59–5–4.5 to county-assessed properties and not to state-assessed properties.

*Id.* at 1260.

*Amax Magnesium Corp.* and *Rio Algom Corp.* clarify the demands of sections 2 and 3 of article XIII with respect to discounts from fair market value. The rule is that a discount must be applied uniformly and equally to all property assessed according to the same appraisal method. Otherwise, taxpayers will not shoulder the burden of taxation in proportion to the value of property owned. As applied in the case before us, an absorption discount violates this rule.

The county assessor valued the Benchmark lots according to the comparable sales method for determining fair market value. This is the same method the assessor used to determine the value of all other lots in the subdivision. Notwithstanding the uniform method of appraisal, the Commission discounted the retail value of the

Benchmark lots, acknowledging that the same discount is unavailable for owners of individual lots in the same subdivision. This nonuniform application of the discount permits two residential lots of equivalent retail value to be taxed at different rates, not because of any real difference in the properties or their fair market value, but because one owner owns multiple lots and the other does not. Such a scheme is not uniform and equal and does not distribute the burden of taxation in proportion to the value of property owned.

The Oregon Supreme Court reached a similar conclusion regarding absorption discounts in *Mathias v. Department of Revenue*, 312 Or. 50, 817 P.2d 272 (1991). In that case, taxpayers challenged the constitutionality of section 308.205 of the Oregon Revised Statutes. That section provided, "If the property consists of four or more lots within one subdivision, and the lots are held under one ownership, the lots shall be valued under a method which recognizes the time period over which those lots must be sold in order to realize current market prices for those lots." *Id.*, 817 P.2d at 273.

The taxpayers owned a single vacant residential subdivision lot that had been valued according to the comparable sales method of appraisal. Adjacent lots were valued by the same method, but that value was "substantially reduced ... for tax purposes for all situations in which four or more lots had the same owner." *Id.* The taxpayers argued that the statute mandated a "double standard of valuation[ ] for the same class of property (subdivision lots)" and therefore violated the "rule of uniformity of taxation for the same class of property" required by article I, section 32 of the Oregon Constitution. *Id.*

The Oregon Tax Court held for the taxpayers, finding that the statute "directly violates" the uniformity provisions of the Oregon Constitution. *Id.* at 273–74. The tax court wrote:

"Property of the same class, i.e. lots in subdivisions, are not subject to uniform taxation. Owners of lots of equal true cash value would not pay taxes on equal values. This is not because the proper-

ties are different or are used differently but simply because the owners are different. It is difficult for this court to imagine a more discriminatory scheme."

*Id.* (quoting *Mathias v. Department of Revenue*, 11 Or.Tax 347, 352, 1990 WL 47655 (1990)). The Oregon Supreme Court affirmed the decision of the tax court. In doing so, the court wrote, "The amount of other property that a taxpayer owns is not a rational basis for distinguishing between otherwise identical lots for tax purposes." *Id.*, 817 P.2d at 279.

■ In summary, unless the absorption discount is applied uniformly to all lots assessed according to the same method of appraisal, the discount violates sections 2 and 3 of article XIII of the Utah Constitution. We held in *Rio Algom Corp.* that if " 'assessors have not appraised at full value but only at a fixed percentage of true value, then such treatment must be uniform and equal on all real estate and tangible property.' " 681 P.2d at 194 (quoting *Kittery Elec. Light Co. v. Assessors*, 219 A.2d 728, 734 (Me.1966)).

In any event, as the Board indicates in its brief, applying an absorption discount uniformly and equally is a practical impossibility. Uniform application would require the county assessor to determine whether a taxpayer is the owner of one or many lots. If a taxpayer owns two or more lots, the assessor will then be required to determine which of the lots owned were listed for sale on tax day and to predict a period during which the lots in question could reasonably be expected to be sold. The assessor will also be required to calculate the holding and transactional costs incurred by the taxpayer with respect to each of the properties he or she owns and determine an appropriate discount rate. Determining value according to this method for even one taxpayer is difficult. Doing it for every owner in the county is an administrative nightmare.

Finally, we note that there is a "fuzzy-line of demarcation between a developer and a person owning multiple lots." *Supervisor of Assessments v. St. Leonard Shores Joint Venture*, 61 Md.App. 204, 486

A.2d 206, 212 (1985). In reference to that line, the Maryland Court of Appeals wrote: "[E]xactly where should the line be drawn? Is the taxpayer who owns four lots or ten lots treated differently than a developer with twenty (plus) lots? Such differential treatment is facially unfair and possibly unconstitutional." *Id.*, 486 A.2d at 212.

Even more troublesome to us, however, is the fuzzy line of demarcation between a developer and the owner of a single lot. The premise of absorption valuation is that by listing all of his or her lots for sale, a developer gluts the market—the number of lots for sale exceeding the number of willing buyers. In this predicament, the developer is forced to sell lots over time as willing buyers become available. This reasoning, according to the Commission, justifies a developer discount reflecting the absorption period. However, the seller of a single lot is in the same predicament. By listing his or her single lot for sale, an owner competes with all other sellers of similar lots for a sale to a limited number of willing buyers. It is possible, and in many cases probable, that the single lot will not be sold in the first tax year. The number of sales the market will bear impacts single lot owners and developers uniformly, but the Commission, by granting an absorption discount, softens the blow exclusively for developers.

For all these reasons, we conclude that an absorption discount violates sections 2 and 3 of article XIII of the Utah Constitution.

## STATUTORY ANALYSIS

The constitutional defects outlined above independently justify reversal of the Commission's determination; however, we write further to illustrate the inconsistency between absorption valuation and the ad valorem taxation scheme delineated in section 59–2–103(1) and section 59–2–304 of the Utah Code.

As noted above, sections 2 and 3 of article XIII of the Utah Constitution require that property be assessed according to "its value" and "according to its value in money." Section 59–2–103(1) implements this "market value" requirement. It provides, "All tangible taxable property shall be assessed and taxed at a uniform and equal rate on the basis of its fair market value, as valued on January 1, unless otherwise provided by law." Utah Code Ann. § 59–2–103(1). The Code defines "fair market value" as the "amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Utah Code Ann. § 59–2–102(7).

Absorption valuation errs in its premise that a "willing buyer" must actually exist. It may be true that Benchmark could not sell all 44 lots in a single tax year—there simply may not be enough "willing buyers." For this reason, Benchmark contends that the lots should be valued as of the time willing buyers actually exist. We note that the owner of a single lot could make the same argument. When a single lot owner lists his property for sale, that lot competes with all other sellers of similar lots for a sale to an existing willing buyer. However, for tax purposes, it is irrelevant that a "willing buyer" for each lot taxed does not in fact exist. Section 59–2–103(1) contemplates nothing more than a *hypothetical* sale to a *hypothetical* willing buyer during the tax year. The sale is a statutory fiction indulged in by appraisers to arrive at fair market value.

We agree with the holding of the Maryland Court of Appeals in *St. Leonard Shores Joint Venture v. Supervisor*, 307 Md. 441, 514 A.2d 1215, 1217 (1986):

Regardless of whether a buyer for each lot actually exists, the assessor is required to assess each lot as if a willing buyer exists. This is not to say that a glut on the market should not be considered. We think, however, that the condition of the real estate market is adequately reflected in the price that a hypothetical buyer would be willing to pay. Therefore, we reject appellant's contention relating to the "sell-out period" of lots.

Finally, as calculated in the case before us, the absorption discount results in double-counting of transactional costs. The version of section 59–2–304 in force when this controversy arose read as follows:

> If the county assessor uses the comparable sales or cost appraisal method in valuing taxable property for assessment purposes, the assessor is required to recognize that various fees, services, closing costs, and other expenses related to the transaction lessen the actual amount that may be received in the transaction. The county assessor shall, therefore, take 80% of the value based on comparable sales or cost appraisal of the property for purposes of assessment under Subsection 59–2–103(1).

1987 Utah Laws ch. 4, § 72 (retrospective operation to January 1, 1987).[2]

Before the Commission, Benchmark's witness, Howard Layton, testified that in computing the value of property under the absorption method of appraisal, the appraiser must deduct from the retail value certain transactional or holding costs. Regarding these costs, the following exchange took place between Layton and Benchmark's counsel:

> QUESTION: What costs did you determine to be appropriate, costs to be deducted by the holding period, and how did you estimate the nature or amount of those costs?
>
> ANSWER: The costs that are incurred to a buyer or owner of a property like this who intends to sell them over time are marketing for commissions, closing costs for each lot, real estate taxes as a result of holding the lots, and other miscellaneous expenses. The miscellaneous expense is a monthly cost estimate for basically maintaining the property, weed control, or other possible assessments.

This response shows the overlap. Under section 59–2–304, fair market value of county-assessed property included a 20 percent discount based on fees, services, closing costs and other expenses related to the transaction. 1987 Utah Laws ch. 4, § 72. According to Mr. Layton, absorption valuation requires fair market value to be discounted a second time for closing costs, commissions, holding costs, and miscellaneous expenses. Such double-counting is further evidence that absorption appraisal is inconsistent with Utah's statutory taxation scheme.[3] While lending institutions may rely on the absorption method to value property, the Utah Code does not.[4]

## CONCLUSION

Because absorption valuation violates sections 2 and 3 of article XIII of the Utah

---

2. The current version of 59–2–304 provides for a diminished discount based on substantially the same transaction costs. It reads:

   > From January 1, 1991, to December 31, 1993, when determining the fair market value of taxable property for assessment purposes, the county assessor should recognize and take into account that the effects of *intangible values* on real property may lessen the actual amount that may be received in a particular sales transaction, and may deduct up to 5% of the value of the real property to adjust for intangible values.

   Utah Code Ann. § 59–2–304(1) (emphasis added). Under the Code, "intangible value" includes "various fees, services, closing costs, and brokerage commissions related to a real property sales transaction." Utah Code Ann. § 59–2–102(12).

3. The same double-counting would occur under the current version of section 59–2–304 since "intangible value" includes "various fees, services, closing costs, and brokerage commissions related to a real property sales transaction." Utah Code Ann. § 59–2–102(12).

4. The commission relied on Federal Home Loan Bank Board regulation 41(c), which provides:

   > For subdivisions, condominiums, timeshares or any project sold off in parcels to various buyers over time, the appraiser must analyze and report the value as if the total group of parcels were sold as a bulk transaction to a single purchaser who, in turn, would sell them off over time to the ultimate buyers of each individual lot, home, condominium or timeshare unit.
   >
   > (1) From the summary of the individual unit value, the appraiser must make all appropriate deductions and discounts to arrive at the estimate of the value to that single buyer.
   >
   > (2) These discounts would include marketing and sales, seller's share of any escrow and title costs, property taxes and maintenance during the sales period, general and administrative expenses of the disposition effort, the cost of capital (both borrowed and in equity), and an entrepreneurial profit to attract an investor to purchase the block of units for resale purposes.

Constitution and because it is inconsistent with Utah's statutory scheme of ad valorem taxation, we reverse the Commission's order.

HALL, C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.